**Frank DeJOY, Plaintiff,**

v.

**COMCAST CABLE COMMUNICATIONS INC., Suburban Cablevision, Comcast Cable of New Jersey, Thomas Baxter, individually and his official capacity, and Michael Doyle, individually and in his official capacity, Defendants.**

**Civil Action No. 96–1135 (AJL).**

United States District Court,
D. New Jersey.

March 21, 1997.

Robert A. White, Morgan, Lewis & Bockius, Philadelphia, PA, for Defendants.

Mark J. Blunda, Sills Cummis Zuckerman Radin, Newark, NJ, for Plaintiff.

## OPINION

LECHNER, District Judge.

This is an action by Frank DeJoy ("DeJoy") against Comcast Cable Communications, Inc. ("Comcast Cable"), Suburban Cablevision ("Suburban Cablevision"), Comcast Cable of New Jersey, Thomas Baxter ("Baxter") and Michael Doyle ("Doyle") (collectively, the "Defendants"). The amended complaint (the "Amended Complaint"), filed 28 June 1996, asserts claims pursuant to the Age Discrimination in Employment Act (the "ADEA"), 29 U.S.C. § 621 *et seq.*, the Americans with Disabilities Act (the "ADA"), 42 U.S.C. § 12101 *et seq.*, the New Jersey Law Against Discrimination (the "NJLAD"), *N.J.S.A.* 10:5–12 *et seq.*, as well as various common law contract and tort claims, arising from the termination of DeJoy's employment with Suburban Cablevision. Jurisdiction is alleged pursuant to 28 U.S.C. §§ 1331 and 1343, 29 U.S.C. § 626(c) and 42 U.S.C. § 12117(a). Amended Complaint, ¶ 2. Pendant jurisdiction is alleged over the State and common law claims. *Id.* Diversity jurisdiction is not alleged.

Currently before the court is Defendants' motion for summary judgment (the "Motion for Summary Judgment").[1] For the reasons set forth below, the Motion for Summary Judgment is granted in part and denied in part.

*Facts*

### A. *Parties*

DeJoy is a citizen of the State of New Jersey. Amended Complaint, ¶ 7. Comcast Cable is a corporation "doing business throughout the State of New Jersey" and maintaining offices in Union, New Jersey. *Id.*, ¶ 8. At all relevant times, Baxter was the President of Comcast Cable. *Id.*, ¶ 9. At all relevant times, Doyle was Regional Vice President of Comcast Cable. *Id.*, ¶ 10. At all relevant times, Suburban Cablevision was a corporation "doing business in the State of New Jersey" and maintaining offices in Union, New Jersey. *Id.*, ¶ 11. Comcast Cable is "a successor entity to Suburban Cablevision." *Id.*

### B. *Procedural History*

DeJoy filed a timely charge of employment discrimination with the Equal Employment Opportunity Commission (the "EEOC"), on 14 June 1995. Amended Complaint, ¶ 4; *see* 29 U.S.C. § 626(d); 42 U.S.C. § 2000e–5(e)(1). On 26 January 1996, the EEOC provided DeJoy with a "notice of right to sue." Amended Complaint, ¶ 5 & Exh. A. DeJoy timely filed a complaint (the "Complaint") on 15 March 1996. *See* 29 U.S.C. § 626(d); 42 U.S.C. § 2000e–5(f)(1).

On 21 May 1996, Defendants served DeJoy with a notice of motion to dismiss the Complaint (the "Motion to Dismiss"). In response to the Motion to Dismiss, DeJoy requested and was given leave to file the Amended Complaint. On 8 October 1996, through an opinion and an order filed that date, the ADA and ADEA claims in counts I, III and V of the Amended Complaint were dismissed as to Baxter and Doyle and count VI of the Amended Complaint was dismissed

---

1. DeJoy submitted: Plaintiff's Brief in Opposition to Defendants' Motion for Summary Judgment (the "Opposition Brief"); Plaintiff's 12G Statement of Undisputed Material Facts (the "DeJoy 12G Statement"); Certification of Mark J. Blunda (the "Blunda Cert."), with exhibits.

Defendants submitted: Memorandum of Law in Support of Defendants' Motion for Summary Judgment (the "Moving Brief"), attaching exhib-

its; Defendants' 12G Statement of Undisputed Material Facts (the "Defendants' 12G Statement"); Defendants' Reply Brief in Support of their Motion for Summary Judgment (the "Reply"), attaching exhibits.

Transcripts of depositions, submitted by the parties, will be cited as: [name] Tr. at [page number].

as to all Defendants. *See DeJoy v. Comcast Cable Communications Inc.*, 941 F.Supp. 468, 478 (D.N.J.1996) (*"DeJoy I "*). The Motion to Dismiss was denied to the extent it sought the dismissal of counts XI and XII of the Amended Complaint. *Id.*

## C. *Background*

DeJoy was born on 12 January 1939 and at the time of the alleged discrimination was fifty-six years old. Blunda Cert., Exh. W. At the time of the alleged discrimination, DeJoy had approximately thirty years of experience in the cable industry. DeJoy 12G Statement, ¶ 7.

DeJoy started his employment with Suburban Cablevision in 1981. Blunda Cert., Exh. X. He began as the Vice President of Engineering, was promoted to Vice President of Operations and eventually became Vice President and General Manager of the enterprise in 1988. *Id.* DeJoy remained in the position of Vice President and General Manager from January of 1988 until January of 1995. *Id.;* DeJoy Dep. at 269.

Prior to 22 December 1994, Suburban Cablevision was owned by Maclean–Hunter, Inc. ("Maclean–Hunter"), a Canadian corporation. DeJoy Dep. at 329. At all relevant times prior to 22 December 1994, Rogers Communications, Inc. ("Rogers Communications"), another Canadian corporation, was the beneficial owner of all shares of Maclean–Hunter. Moving Brief, Exhibit F.

On 1 June 1994, in anticipation of a possible sale by Maclean–Hunter, DeJoy entered into a severance agreement (the "Severance Agreement") with Maclean–Hunter and Suburban Cablevision. Moving Brief, Exh. F. The Severance Agreement provided, in pertinent part:

> WHEREAS it is currently contemplated that Rogers Communications ... will endeavor to obtain an acceptable offer from a third-party purchaser to purchase the shares of [Maclean–Hunter] and, if a sale is completed ... a Control Change (as hereinafter defined) will occur; [2]
>
> AND WHEREAS in the event of a Control Change, there is a possibility that the employment of [DeJoy] would be terminated without cause or adversely modified and [DeJoy] has expressed concern in that regard;
>
> AND WHEREAS it is in the best interests of [Maclean–Hunter] and [Suburban Cablevision] to induce [DeJoy] to remain in the employ of [Suburban Cablevision] by indicating that in the event of a Control Change, [DeJoy] would have certain rights on a termination of [his] employment;
>
> NOW THEREFORE ... the parties hereby agree as follows
>
> \* \* \* \* \* \*
>
> 2. If [DeJoy] remains employed by [Suburban Cablevision] for a period of six months following a Control Change (or [his] employment is terminated within such six-month period by [Maclean–Hunter] other than for Just Cause,[3] death or permanent disability, or by [DeJoy] for Good Reason),[4] [Maclean–

---

**2.** A "Control Change" is defined in the Severance Agreement as a "sale of all of the shares of [Maclean–Hunter], or any other sale of securities ... occurring before January 1, 1996, as a result of which [Suburban Cablevision] ceases to be controlled directly or indirectly, by [Maclean–Hunter Ltd. ('MHL'), the parent corporation of Maclean–Hunter,] or a successor or affiliate of MHL[.]" Moving Brief, Exh. F.

**3.** "Just Cause" is defined in the Severance Agreement as:

 (i) the continued failure by [DeJoy] to perform his or her duties according to the terms of his or her employment (other than any such failure resulting from [DeJoy's] disability) after [Maclean–Hunter] or [Suburban Cablevision] has given [DeJoy] reasonable notice of such

failure and a reasonable opportunity to correct it;

 (ii) the engaging by [DeJoy] in any act which is injurious to [Maclean–Hunter] or [Suburban Cablevision], monetarily or otherwise; or

 (iii) the engaging by [DeJoy] in any criminal act of dishonesty resulting or intended to result directly or indirectly in personal gain of [DeJoy] at the expense of [Maclean–Hunter] or [Suburban Cablevision][.]

Moving Brief, Exh. F.

**4.** "Good Reason" is defined in the Severance Agreement as

the occurrence of either of the following without [DeJoy's] written consent ...:

 (i) a material reduction by [Maclean–Hunter] or [Suburban Cablevision] of [DeJoy's] salary or

Hunter] shall pay, or cause [Suburban Cablevision] to pay to [DeJoy] ... a one-time bonus equal to:

(a) if [Suburban Cablevision] realizes cash flow from its operations during the 1994 calendar year not less than that provided for in [its] budget forecast ... one-half of [DeJoy's] Annual Salary; or

(b) if the condition in subparagraph (a) is not satisfied, one-third of [DeJoy's] Annual Salary.

3. If [DeJoy's] employment is terminated by [Maclean–Hunter] or [Suburban Cablevision] other than for Just Cause, permanent disabilities or death or is terminated by [DeJoy] for Good Reason, in each case at any time within the Period following a Control Change, [Maclean–Hunter] shall pay, or cause [Suburban Cablevision] to pay to ... [DeJoy] ... an amount equal to the result obtained when one-twelfth of the Annual Salary is multiplied by the Period.

Moving Brief, Exh. F.

In June of 1994, Comcast Cable entered into an agreement of sale with Rogers Communications to purchase Rogers Communications' cable properties, including Maclean–Hunter's properties, located in the United States. These properties included Suburban Cablevision. DeJoy Dep. at 207.

In July of 1994, representatives of Comcast Cable met with representatives of the New Jersey Office of Cable Television (the "Office of Cable Television") (the "July 1994 Meeting"). DeJoy Dep. at 272. The purpose of the July 1994 Meeting "was to address the Director of the Office of Cable Television and the members of her staff regarding the expected acquisition [of Suburban Cablevision] ... by Comcast [Cable]." *Id.* DeJoy contends that during the July 1994 Meeting, "statements were made that there would be no changes in the structure [of Suburban Cablevision], certainly not in the management structure...." *Id.* at 275.

On 31 August 1994, DeJoy had a meeting with William J. Quinn ("Quinn"), the president of "Cablevision," a competitor of Suburban Cablevision (the "31 August 1994 Meeting"). DeJoy Dep. at 284–87. During the course of the 31 August 1994 Meeting, Quinn allegedly offered DeJoy employment at Cablevision. *Id.; see* Blunda Cert., Exh. T.

At the 31 August 1994 Meeting, Quinn and DeJoy discussed the possibility of DeJoy taking the position of regional vice-president and general manager for northern New Jersey for Cablevision, a position Quinn intended to create. DeJoy Dep. at 284–87; Blunda Cert., Exh. T. DeJoy advised Quinn he preferred to remain with Suburban Cablevision, depending upon Comcast Cable's intentions for his continued employment. DeJoy 12G Statement, ¶ 15.

On 1 September 1994, representatives of Comcast Cable, including Baxter and Doyle, met with representatives of Suburban Cablevision, including DeJoy, and Maclean–Hunter to discuss the upcoming acquisition. Doyle Dep. at 289. After the meeting, Doyle met privately with DeJoy. *Id.* at 292–93. DeJoy states that Doyle told him that he "should not be concerned about the future because [DeJoy] was going to be Area Vice–President." *Id.* at 293. DeJoy states Doyle explained that DeJoy would remain "responsible for the properties [he] was currently managing, as well as the system in Meadowlands, in Kearny, and a system in Plainfield." *Id.* DeJoy further states Doyle predicted that "over the next year or two, [DeJoy's] responsibility would expand to the northern half of New Jersey." *Id.* It does not appear DeJoy informed Doyle of his alleged offer of employment from Cablevision. *Id.* DeJoy states that in reliance upon Doyle's assurance that DeJoy would "be Area Vice–President with expanding responsibilities, [he] dismissed the other proposal from Cablevision." *Id.*

On 2 December 1994, Doyle, Baxter and Allen Peddrick ("Peddrick"), Vice President

---

any material adverse change in the basis upon which [DeJoy's] salary or commission is determined; or

(ii) the failure by [Maclean–Hunter] or [Suburban Cablevision] to obtain a legally effective

assumption of its respective obligations hereunder by any successor to [Maclean–Hunter] or [Suburban Cablevision.]

Moving Brief, Exh. F.

of Human Relations for Comcast Cable, held two information sessions, one in the morning and one in the afternoon, with all employees of Suburban Cablevision and Cable Television of Jersey City. Doyle Dep. at 215–16. During the videotaped morning session, Doyle represented DeJoy would continue to run Suburban Cablevision. *Id.* at 212. Doyle specifically stated:

> I—my job is I'm the regional vice president in charge of operations for New Jersey, City of Philadelphia and two suburbs. . . . *Frank DeJoy runs the business,* he reports to me and it's my responsibility to continue running the business and while at some time, you know, Frank may see— Frank may see it and the management staff may see it that they would like to have somebody who has Comcast [Cable] history as part of that management team, that would be something we would talk about. But at this point there is no plan to, you know, have a Comcast [Cable] executive come into the building.

Doyle Dep. at 212–13 (emphasis added). During the afternoon session, Doyle reportedly made similar statements, indicating that DeJoy would remain in his position. Joseph J. Albarella ("Albarella") Dep. at 75–76; Margaret Smeraldo Bucci ("Bucci") Dep. at 109–113. DeJoy states that, during the afternoon session, Doyle specifically stated DeJoy would remain Area Vice–President and General Manager of Suburban Cablevision. DeJoy Dep. at 420.

On 8 December 1994, DeJoy suffered a ruptured aortic aneurysm. Alan S. Bahler, M.D. ("Bahler") Dep. at 6. On 9 December 1994, Phil Patterson, President of Maclean–Hunter Cable TV ("Patterson"), circulated a memorandum (the "9 December 1994 Memorandum") regarding DeJoy's condition. Moving Brief, Exh. H. The 9 December 1994 Memorandum, which was sent to Baxter, provided:

> At approximately 5:30 a.m. yesterday morning, Frank DeJoy, Vice President and General Manager in charge of our New Jersey operations, collapsed as a result of an aneurism which burst in a vein near his heart. All the details are still not clear to me. Frank was operated on an hour later

with, I am told, great success. He is still not out of the woods since he will remain in intensive care for several days and will probably spend two to three weeks in total in the hospital. The total recovery period is expected to be two to three months. *Id.* After surgery, DeJoy remained hospitalized until 26 December 1994. DeJoy Dep. at 445. On 20 December 1994, Patterson approved an administrative memorandum (the "Full Pay Memorandum") which provided that DeJoy would remain on full pay while on disability leave. Blunda Cert., Exh. Y.

On 22 December 1994, Comcast Cable closed on its acquisition of Suburban Cablevision. Defendants 12G Statement, ¶ 3. On 11 January 1995, while he was recuperating at home, DeJoy was informed he would be replaced by Joseph Fischer ("Fischer") as Vice–President of Suburban Cablevision and that he would be offered a position "reporting to . . . Fischer." DeJoy Dep. at 464. The position offered to DeJoy was "Director of Business Development," a position that Comcast Cable intended to create. *Id.* at 466.

At the time he replaced DeJoy, Fischer was forty-four years old. Fischer Dep. at 7. Bucci, who was head of human resources for Suburban Cablevision, states that in January of 1995 Peddrick told her the decision to replace DeJoy had been made on 12 December 1994. Bucci Dep. at 138–39. In addition to being removed as Vice President, DeJoy was removed as General Manager; in March of 1995, Michael Schenker ("Schenker") was named the new General Manager of Suburban Cablevision. DeJoy 12G Statement, ¶ 5 (citing Schenker Dep. at 9). Schenker was forty-two years of age at the time. *Id.*

On 24 January 1995, Peddrick sent DeJoy a job description for the position of "Director of Business Development" (the "Job Description"). Blunda Cert., Exh. P. The Job Description provided:

> *POSITION SUMMARY:* Responsible for securing interactive and other business opportunities to keep Comcast [Cable] positioned as a market leader of their services against NJ Bell. Also, maintain government and community relationships in the Suburban system.

*MAJOR DUTIES:*

- Monitor all current NJ Bell activity.

- Develop interactive business opportunities by managing the bidding, public hearing and construction process of interactive business systems.

- Maintain consistent visitation with community leaders to promote strong community relationships.

- Manage the interactive business once constructed.

Blunda Cert., Exh. P. The minimum qualifications for the position of Director of Business Development were provided: "Bachelor's degrees in related field or the recognized equivalent in work experience and self-study ... [and five] years experience in interactive business applications." *Id.*

The Job Description provided DeJoy would report to Fischer. Blunda Cert., Exh. P. By a letter, dated 24 January 1995, Peddrick informed DeJoy the annual salary for the position of Director of Business Development would be "$144,384 along with the Comcast [Cable] benefit package." Moving Brief, Exh. I. The total compensation package of the Director of Business Development position would have been less than DeJoy's prior position at Suburban Cablevision. DeJoy 12G Statement, ¶ 34. Furthermore, the position of Director of Business Development was not contained in a table of organization contained in "Cable Gram," a newsletter for Suburban Cablevision and Cable TV of Jersey City employees, dated 24 March 1995. Blunda Cert., Exh. R.

Suburban Cablevision paid for a long term disability insurance policy that provided benefits for employees after 120 days of medical leave. DeJoy Dep. at 469–470, 475, 477, 479–80; Peddrick Dep. at 98–99. DeJoy states that, despite a written policy that an employee would have to go on long term disability after 120 days, unofficially "there was a practice to pay members of the Management Committee[, such as DeJoy,] full salary for up to a year in the event they had a serious illness." DeJoy Dep. at 470. This "unofficial practice," according to DeJoy, had been

started several years prior to 1994. *Id.* at 471.

Despite the Full Pay Memorandum and the unofficial practice of paying members of the Management Committee their full salary for up to a year, DeJoy was informed he would be removed from the payroll, effective 7 April 1995. DeJoy Dep. at 476–77; Moving Brief, Exh. K (letter of Dina Galeotafiore, dated 31 March 1995 (the "31 March 1995 Letter")). The 31 March 1995 Letter provided, in relevant part:

I am writing to you with regard to your disability benefits and how the same relate to your overall compensation.

Specifically, as of the 120th day of your disability, April 7, 1995, your compensation for the remainder of your disability will be provided by the long term disability carrier, and no longer by Comcast [Cable] under the Suburban [Cablevision] plan.

At this time it is necessary for you to file a claim with Fort Dearborn Life Insurance Co. for long term benefits.

As of April 7th, your Fort Dearborn long term disability plan will begin to assume responsibility for compensation of lost wages, as per the terms of the group policy. This amount will equal 50% of your monthly wages up to a maximum of $2,500.00 for as long as you remain totally disabled and out of work.

Moving Brief, Exh. K. DeJoy never filled out an application for long term disability payments. Peddrick Dep. at 113; DeJoy Dep. at 697.

While on salary status with Suburban Cablevision, and later Comcast, DeJoy paid $16.50 every two weeks for his insurance coverage, which was deducted directly from his paycheck. DeJoy Dep. at 549. After DeJoy was taken off of salary status, it became necessary for him to write a check to Comcast Cable for the insurance payment that had previously come out of his paycheck. DeJoy Dep. at 549–51; Peddrick Dep. at 111.

DeJoy did not accept the offer of the Director of Business Development position. DeJoy Dep. at 54–59. On 5 June 1995, Counsel for DeJoy informed Comcast that DeJoy intended to invoke his Severance

Agreement. *Id.* at 520; Moving Brief, Exh. J (letter of Mark J. Blunda, dated 5 June 1995 (the "5 June 1995 Letter")). The 5 June 1995 Letter provided, in relevant part:

> In view of [Comcast's] removal of ... DeJoy from the position of Area Vice–President and General Manager in January of 1995, its elimination of his commission benefits and its unilateral reduction in his compensation package by approximately $50,000, ... DeJoy hereby invokes paragraph 3 of the June 1, 1994 Memorandum of Agreement between Maclean–Hunter, Inc., Suburban Cablevision and Frank De-Joy. Pursuant to that provision, Mr. De-Joy is entitled to payment within 10 days of one-twelfth of his Annual Salary multiplied by the number of months equal to his completed years of service (14 months).
>
> For purposes of these calculations the "Annual Salary" is defined as the aggregate of the annual salary and commissions payable to Frank DeJoy for the twelve month period ending November 30, 1994.
>
> In addition, Mr. DeJoy is entitled to receive one-half of his Executive Annual Salary, representing his one-time bonus pursuant to Paragraph 2 of the June 1, 1994 Memorandum of Agreement.
>
> Furthermore, Mr. DeJoy is entitled to payment for commissions throughout the second quarter of 1995, as well as contributions for the 401K and pension plans....
>
> As previously indicated, we reiterate the demand for full salary and benefits for the seven-week period that your client unilaterally disrupted ... DeJoy's pay and insurance status.

Moving Brief, Exh. J.

On 14 June 1995, Comcast sent DeJoy five checks representing (1) a severance payment under paragraph three of the Severance Agreement in the amount of $209,576.50, (2) a payment in the amount of $89,818.50 representing the stay put bonus, pursuant to paragraph 2 of the Severance Agreement, (3) four weeks of accrued vacation pay, including commissions, plus one holiday in the amount of $14,792.95, (4) full salary plus commission from the period 8 April 1995 through 5 June 1995 in the amount of $29,918.62, and (5) the amount remaining in DeJoy's company savings plan in the amount of $3,432.11. Moving Brief, Exh. M. As indicated in the Severance Plan, DeJoy would not have been entitled to receive the severance payment and stay put bonus totaling $299,395.00 if he had left his employment with Suburban Cablevision prior to 22 December 1994, the date Comcast Cable closed on its acquisition of Suburban Cablevision. *See* DeJoy Dep. at 258, 265–66; Moving Brief, Exh. F.

Doyle states that the decision to replace DeJoy was made in November of 1994. Doyle Dep. at 55, 72. At that time, Doyle told Baxter that DeJoy would not continue in the "vice president and general manager role managing the profit and loss statements of the cable system." *Id.* at 73. Doyle recommended Fischer for DeJoy's position. *Id.*

Doyle stated his reasons for choosing Fischer over DeJoy were (1) DeJoy made two inappropriate comments during a 1 September 1994 dinner meeting,[5] (2) Doyle found DeJoy's attitude toward the Comcast Cable's cash flow goals to be unacceptable, (3) the budget presented at Maclean–Hunter's annual budget meeting, in November of 1994, did not meet Comcast Cable's cash flow goals, (4) in "September or October ... DeJoy in front of Mr. Vandervort belittled Dave Brindinger," and (5) DeJoy repeatedly asked Doyle certain questions and would not accept Doyle's answer that Doyle would be unable to answer the questions until the closing. Doyle Dep. at 176–78.

In March of 1994, DeJoy contacted Quinn and asked he memorialize their discussions regarding DeJoy's possible employment with Cablevision. *See* Blunda Cert., Exh. T. At that time, Quinn informed DeJoy the position of Regional Vice President for New Jersey, originally offered to DeJoy, had been filled. *Id.* Quinn, however, informed DeJoy that

---

5. Doyle states that DeJoy made an inappropriate comment regarding Doyle's dinner order. Doyle Tr. at 176. Doyle further states that DeJoy told him an inappropriate story regarding a prostitute DeJoy and Patterson had encountered while in Mexico. *Id.* DeJoy denies making the first statement and states Doyle misrepresents the second story which was intended, and was received, as humorous. DeJoy Dep. at 303–09.

Cablevision was still "interested in discussing other possible positions for him, but that these positions would be at the system management level only." *Id.*

On 5 June 1995, DeJoy commenced employment with Rainbow Programing, as the Senior Vice President of Rainbow Video Services. DeJoy Dep. at 535. DeJoy's starting base salary with Rainbow Video Services was $180,000. *Id.* at 535–36, 543–44. In addition to his base salary, DeJoy received a bonus of $29,000 for the period 5 June 1995 through 31 December 1995. *Id.* at 537–42. DeJoy has also received stock options from Cablevision as compensation. *Id.*

DeJoy's responsibilities at Rainbow Video Services included managing a joint venture between Rainbow Video Services and Bell Atlantic, where Bell Atlantic would provide Rainbow Video Services "a number of channels on their interactive service." DeJoy Dep. at 534–35. DeJoy's responsibilities were "[t]o get involved in the negotiations and discussions, also on the technical side and on the operational side with Bell Atlantic, with hardware providers, and various potential programers, to provide an interactive dial tone service in that market." *Id.* at 535.

In September of 1996, DeJoy became the General Manager of three Cablevision cable systems located in Newark, Hudson and Bayonne, New Jersey. DeJoy Dep. at 547. His salary remained the same as it was as the Senior Vice President of Rainbow Video Services and he has participated in Cablevision's 401(k) plan and receives an automobile allowance. *Id.* at 548–59.

### D. *The Amended Complaint*

The Amended Complaint contains thirteen counts. As indicated, however, count VI of the Amended Complaint has been dismissed and the ADA and ADEA claims contained in counts I, III and V of the Amended Complaint have been dismissed as against Baxter and Doyle. *See DeJoy I*, 941 F.Supp. at 478.

Count I of the Amended Complaint alleges "Defendants, jointly and severally, engaged in unlawful employment practices by removing [DeJoy] from his position and discriminating against [him] because of his age, in violation of the [ADEA]." Amended Complaint, ¶ 41.

Count II of the Amended Complaint alleges "Defendants, jointly and severally, engaged in unlawful employment practices by removing [DeJoy] from his employment and discriminating against [him] because of his age, in violation of the [NJLAD]." Amended Complaint, ¶ 46.

Count III of the Amended Complaint alleges that "[o]n or about December 8, 1994, [DeJoy] became physically disabled as a result of a serious illness which substantially limited one or more of [his] major life activities." Amended Complaint, ¶ 51. DeJoy alleges Defendants "unlawfully removed [him] from his position of Vice President and General Manager and failed to appoint him as Area Vice President because of his disability and/or the perception he was disabled." *Id.*, ¶ 54. Count III alleges Defendants' removal of DeJoy violated the ADA. *Id.*, 57.

Count IV of the Amended Complaint alleges "Defendants have discriminated against [DeJoy] in regard to his employment, compensation, and terms and conditions of employment because of his disability or his perceived disability, in violation of NJLAD." Amended Complaint, ¶ 62. DeJoy alleges both Baxter and Doyle "individually engaged in unlawful employment practices by aiding, abetting, inciting and/or compelling the unlawful acts of discrimination against [DeJoy]." *Id.*, ¶¶ 63–64.

Count V alleges "[d]uring the first six (6) months of 1995, [D]efendants retaliated against [DeJoy] because he engaged in protected activity and opposed their unlawful and discriminatory conduct. The retaliatory action by [D]efendants violated the [NJLAD, the ADA and the ADEA]." Amended Complaint, ¶ 68.

Count VII[6] alleges a claim of fraud/misrepresentation. *See* Amended Complaint at

---

6. Count VI of the Amended Complaint alleged Defendants violated the clear mandate of the public policy of New Jersey against discrimination and retaliation by constructively discharging DeJoy. *Id.*, ¶¶ 71–74. As indicated, count VI

12. DeJoy alleges "[d]uring the final six months of 1994, . . . Doyle repeatedly represented to [DeJoy] that [DeJoy] would be Area Vice President for Northern New Jersey and General Manager of Suburban Cablevision and Cable–TV of Jersey City upon Comcast's acquisition of Suburban Cablevision." *Id.,* ¶ 78. DeJoy alleges Doyle reiterated these comments to "State Regulators and hundreds of employees of Suburban Cablevision . . . ." *Id.,* ¶ 79. DeJoy alleges Baxter had "actual or apparent authority to act on behalf of defendant corporations . . . [and, d]uring the second half of 1994, . . . Baxter reiterated, ratified and condoned to third parties the assurances made by . . . Doyle" regarding DeJoy's continued employment. *Id.,* ¶¶ 80–81. DeJoy alleges he "reasonably and detrimentally relied" upon these assurances, declining to "pursue alternative employment opportunities." *Id.,* ¶¶ 82–84. DeJoy alleges the representations made by Baxter and Doyle were "knowingly false at the time of their making [and were made] with the intent to mislead [DeJoy]." *Id.,* ¶ 84.

Count VIII alleges a breach of contract. DeJoy alleges that, in 1994, Comcast Cable agreed to appoint him Area Vice–President in consideration for his agreement to remain with Comcast Cable when it acquired Suburban Cablevision from Maclean–Hunter. Amended Complaint, ¶ 88. DeJoy alleges Defendants "breached their contract with [him] by removing him from the positions of Vice–President and General Manager of Suburban and by failing and refusing to appoint him Area Vice–President." *Id.,* ¶ 90.

Count IX of the Amended Complaint alleges that, by reason of Defendants' conduct, described in counts I through VII, Defendants are "prohibited under the Doctrine of Promissory Estoppel from avoiding their obligations to [DeJoy]." Amended Complaint, ¶ 93.

Count X of the Amended Complaint alleges "an employment relationship/agreement" existed between DeJoy and Comcast Cable and that Comcast Cable "violated its covenant of good faith and fair dealing with [DeJoy] . . . ." Amended Complaint, ¶¶ 96, 98.

Count XI alleges DeJoy enjoyed a beneficial contractual relationship with Suburban Cablevision, prior to its acquisition by Comcast Cable and that "[d]uring the last six (6) months of 1994 and the first six (6) months of 1995, . . . Doyle and Baxter . . . tortuously interfered with [DeJoy's] contractual relationships with both Suburban Cablevision and Comcast [Cable]." Amended Complaint, ¶ 102a. Count XII alleges DeJoy had a reasonable expectation of long-term prospective economic advantage with Comcast Cable, *id.,* ¶ 105, and that Doyle and Baxter maliciously interfered with DeJoy's prospective economic advantage. *Id.,* ¶ 106. DeJoy alleges "[u]pon information and belief, Baxter and Doyle's unjustified actions[, alleged in counts XI and XII,] were for their own personal gain and advancement." *Id.,* ¶¶ 102(a), 106.

Count XIII alleges the Defendants' conduct, described in the Amended Complaint, "was engaged in intentionally and/or recklessly." Amended Complaint, ¶ 109. DeJoy alleges the

"conduct of the [D]efendants in: defrauding [DeJoy] to remain with [Suburban Cablevision] after its takeover; fraudulently inducing [DeJoy] to seek cooperation from other . . . employees; repeatedly assuring plaintiff that he would be Area Vice President with expanded responsibilities; announcing to regulators and nearly 500 Suburban [Cablevision] employees on December 2, 1994, just six days prior to [De-Joy's] ruptured aortic aneurysm on December 8, 1994, that [DeJoy] would be made Area Vice President; removing [De-Joy] from his position as soon as [D]efendants learned that [DeJoy] was hospitalized in critical condition; removing him from the payroll while disabled despite written agreement to the contrary; threatening to cease his insurance coverage; proposing a non-existent job; and telling him that this economic pressure could be relieved and he could be restored to full salary if he would leave the company quietly is outrageous conduct beyond all bounds of decency."

Amended Complaint, ¶ 110.

DeJoy alleges he has suffered "severe emotional distress," as well as "substantial

has been dismissed. *See DeJoy I,* 941 F.Supp. at 478.

monetary damage, pain and suffering, humiliation and loss of reputation," because of Defendants' "atrocious conduct." Amended Complaint, ¶¶ 111–12.

The *ad damnum* clause of the Amended Complaint demands judgment against Defendants for (a) back pay and benefits, (b) front pay and benefits, (c) injunctive relief, (d) compensatory damages, (e) punitive damages, (f) attorneys' fees, (g) costs of suit, (h) pre- and post-judgment interest and (i) such other relief as the court deems appropriate. Amended Complaint at 18–19.

### E. *Defendants' Arguments*

Defendants argue DeJoy cannot meet his burden of proving Defendants engaged in unlawful age discrimination under either the ADEA or the NJLAD. Moving Brief at 13. Defendants specifically argue DeJoy's "own statements and declarations to this [c]ourt, as well as to the [EEOC] fail to support a claim for age discrimination *and are inconsistent with such an allegation....*" *Id.* (emphasis added). Defendants, moreover, argue DeJoy's allegations of age discrimination are "grounded on nothing more than his subjective belief that he was the victim of discrimination." *Id.* at 15.

In addition to arguing DeJoy cannot meet his burden of proof with respect to counts I and II, Defendants argue DeJoy should be "judicially estopped from pursuing his age discrimination claims." Moving Brief at 16. Defendants argue "DeJoy has consistently maintained ... the decision to remove him [from his position] was because he became sick." *Id.* at 17. Accordingly, Defendants argue DeJoy should not be allowed "to play fast and loose with the facts in this case" and counts I and II of the Amended Complaint should be dismissed. *Id.*

Defendants argue because DeJoy's "claim for age discrimination ... is necessarily inconsistent with his own averments, statements and declarations[,] ... [the c]ourt need not address the burden shifting analysis set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)." Reply at 1–2. Additionally, Defendants argue that "if the [c]ourt engages in [the *McDonnell Douglas* ] analy-

sis, it is clear that Defendants [have] articulated several legitimate, non-discriminatory reasons for removing [DeJoy]...." *Id.* at 2. Defendants, therefore, argue counts I and II should be dismissed even pursuant to the *McDonnell Douglas* analysis. *Id.*

Defendants argue counts III and IV of the Amended Complaint should be dismissed because DeJoy "did not suffer a disability within the meaning of either the ADA or the NJLAD...." Moving Brief at 17. Defendants argue DeJoy has, at most, alleged a temporary impairment from 8 December 1994 to May of 1995. *Id.* at 21. Defendants, moreover, argue DeJoy "was not perceived or regarded as being disabled or handicapped." *Id.* Defendants argue "[b]ecause of the short duration of his condition and his full recovery, it is clear that ... DeJoy's condition did not constitute a disability within the meaning of the ADA or a handicap within the meaning of NJLAD" and, therefore, counts III and IV of the Amended Complaint should be dismissed. *Id.* at 24.

Defendants argue the first time DeJoy, or anyone on his behalf, asserted any allegations of illegal discrimination was on 19 April 1994. Moving Brief at 25. Accordingly, Defendants argue DeJoy cannot maintain a retaliation claim for any of Defendants' alleged conduct prior to 19 April 1995, because it was not until then that DeJoy engaged in protected activity. *Id.* Defendants further argue no alleged retaliation occurred after 19 April 1995 and, therefore, count V of the Amended Complaint must be dismissed. *Id.*

Defendants argue counts VIII and X of the Amended Complaint should be dismissed because DeJoy was an at will employee of Comcast Cable. Moving Brief at 25–26. Accordingly, Defendants argue DeJoy's discharge cannot constitute a breach of contract and DeJoy cannot maintain his claim for breach of a covenant of good faith and fair dealing. *Id.*

Defendants argue counts VII and IX should be dismissed because DeJoy cannot establish the existence of reasonable and detrimental reliance. Moving Brief at 26. Defendants specifically argue (1) DeJoy cannot demonstrate he justifiably or reasonably re-

lied upon Doyle's alleged representations, and (2) even if he were able to prove justifiable or reasonable reliance, DeJoy "did not rely [upon Doyle's] representations to his detriment." *Id.* at 28.

Defendants argue counts XI and XII should be dismissed because DeJoy has "failed to produce any evidence that ... Doyle or Baxter personally gained from their alleged unlawful actions." Moving Brief at 32. Defendants argue, moreover, that DeJoy has produced no evidence of actual malice on the part of either Doyle or Baxter sufficient to establish his claims for interference with contractual relations and prospective economic advantage. *Id.*

Defendants argue count XIII of the Amended Complaint, alleging a claim for intentional infliction of emotional distress, should be dismissed because Defendants' alleged conduct was not extreme and outrageous. Moving Brief at 33. Defendants argue that "[e]ven accepting all of [DeJoy's] allegations as true, they simply do not rise to the level of extreme and outrageous conduct to sustain a claim for intentional infliction of emotional distress." *Id.* Defendants further argue DeJoy "can present no evidence that he has suffered emotional distress *so severe that no reasonable person could be expected to endure* as is required under the law." *Id.* at 37–38 (emphasis in original). Finally Defendants argue DeJoy's claim for intentional infliction of emotional distress is barred by the New Jersey Workers' Compensation Act. *Id.* at 38.

*Discussion*

A. *Standard for Summary Judgment*

To prevail on a motion for summary judgment, the moving party must establish "there is no genuine issue as to any material fact and that [it] is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Orson, Inc. v. Miramax Film Corp.,* 79 F.3d 1358, 1366 (3d Cir.1996); *Witco Corp. v. Beekhuis,* 38 F.3d 682, 686 (3d Cir.1994). A district court, however, may not resolve factual disputes on a motion for summary judgment. *Linan–Faye Constr. Co. v. Housing*

*Auth.,* 49 F.3d 915, 926–27 (3d Cir.1995) ("at the summary judgment stage, 'the judge's function is not ... to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial' ") (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986)); *Desvi, Inc. v. Continental Ins. Co.,* 968 F.2d 307, 308 (3d Cir.1992).

In considering a motion for summary judgment, all evidence submitted must be viewed in a light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *Healey v. Southwood Psychiatric Hosp.,* 78 F.3d 128, 130–31 (3d Cir.1996); *General Ceramics Inc. v. Firemen's Fund Ins. Cos.,* 66 F.3d 647, 651 (3d Cir.1995); *Meyer v. Riegel Products Corp.,* 720 F.2d 303, 307 n. 2 (3d Cir.1983) (the court must resolve "all inferences, doubts and issues of credibility ... against the moving party"), *cert. dismissed,* 465 U.S. 1091, 104 S.Ct. 2144, 79 L.Ed.2d 910 (1984). "This standard is applied with added rigor in employment discrimination cases, where intent and credibility are crucial issues." *Robinson v. PPG Indus., Inc.,* 23 F.3d 1159, 1162 (7th Cir.1994).

When the resolution of issues depends wholly upon the interpretation of specific statutory language and the applicable law, summary judgment is appropriate. See *DiBiase v. SmithKline Beecham Corp.,* 48 F.3d 719, 724 (3d Cir.), *cert. denied,* —— U.S. ——, 116 S.Ct. 306, 133 L.Ed.2d 210 (1995); *see also Gans v. Mundy,* 762 F.2d 338, 341 (3d Cir.) ("summary judgment is proper where the facts are undisputed"), *cert. denied,* 474 U.S. 1010, 106 S.Ct. 537, 88 L.Ed.2d 467 (1985); *Estate of Reddert v. United States,* 925 F.Supp. 261, 265 (D.N.J.1996).

In addition, when the nonmoving party bears the burden of proof at trial, the moving party is entitled to summary judgment by showing "there is an absence of evidence to support the nonmoving party's case." *Celotex,* 477 U.S. at 325, 106 S.Ct. at 2554; *see Lawrence v. National Westminster Bank New Jersey,* 98 F.3d 61, 65 (3d Cir.1996). Once the movant demonstrates an essential

element of the nonmovant's case is lacking, the nonmovant must come forward with sufficient evidence to demonstrate there is a factual controversy as to that element. *Anderson,* 477 U.S. at 247, 106 S.Ct. at 2509–10; *Siegel Transfer, Inc. v. Carrier Exp., Inc.,* 54 F.3d 1125, 1130–31 (3d Cir.1995); *Witco,* 38 F.3d at 686. "The mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson,* 477 U.S. at 252, 106 S.Ct. at 2512; *Matsushita,* 475 U.S. at 586, 106 S.Ct. at 1356 (nonmovant must "do more than simply show that there is some metaphysical doubt as to the material facts"); *accord Siegel,* 54 F.3d at 1130–31; *Nevets C.M., Inc. v. Nissho Iwai Am. Corp.,* 726 F.Supp. 525, 534 (D.N.J. 1989), *aff'd without Op'n,* 899 F.2d 1218 (3d Cir.1990).

If the nonmovant fails to make a sufficient showing regarding an essential element of its case upon which it will bear the ultimate burden of proof at trial, all other facts are necessarily immaterial and summary judgment must be granted. *Celotex,* 477 U.S. at 321, 106 S.Ct. at 2551–52; *Siegel,* 54 F.3d at 1130–31; *see also Armstrong v. City of Dallas,* 997 F.2d 62, 67 (5th Cir.1993) ("[s]ummary judgment is appropriate where critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the nonmovant, or where it is so overwhelming that it mandates judgment in favor of the movant").

In a discrimination action, the defendant must establish "the plaintiff will be unable to introduce either direct evidence of discrimination or indirect evidence by showing that the proffered reason for the employment action is subject to factual dispute." *Hankins v. Temple University,* 829 F.2d 437, 440 (3d Cir.1987); *Weldon v. Kraft,* 896 F.2d 793, 797 (3d Cir.1990).

### B. *Age Discrimination*

■ The ADEA was enacted in 1967 "to promote employment of older persons based on their ability rather than age; to prohibit arbitrary age discrimination in employment; [and] to help employers and workers find ways of meeting problems arising from the impact of age on employment." 29 U.S.C. § 621(b). The ADEA is intended to further the dual goals of compensating victims of discrimination and deterring employers from discriminating against older workers. *Long v. Sears Roebuck & Co.,* 105 F.3d 1529, 1541–42 (3d Cir.1997). The ADEA makes it illegal for employers to refuse to hire, to fire or to discriminate against an employee "with respect to his [or her] compensation, terms, conditions, or privileges of employment, because of such individual's age." [7] 29 U.S.C. § 623(a)(1). A cause of action under the ADEA is limited to plaintiffs who are at least forty years of age. 29 U.S.C. § 631. The NJLAD is similarly designed to address and eliminate employment discrimination. *See McKenna v. Pacific Rail Service,* 32 F.3d 820, 827 (3d Cir.1994).

#### 1. *Defendants' Arguments*

As indicated, Defendants argue DeJoy's claims of age discrimination should be dismissed because (1) DeJoy has failed to adduce any evidence to meet his ultimate burden of proof, and (2) he should be judicially estopped from pursuing his age discrimination claims. *See* Moving Brief at 16. As will be discussed, these arguments are without merit.

#### a. *Burden of Proof*

■ To recover in an age discrimination suit, a plaintiff must prove, by a preponderance of the evidence, age was a determinative

---

7. Section 623 provides in pertinent part:

It shall be unlawful for an employer-
(1) to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his [or her] compensation, terms, condition, or privileges of employment, because of such individual's age;

(2) to limit, segregate, or classify his [or her] employees in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his [or her] status as an employee, because of such individual's age; or
(3) to reduce the wage rate of any employee in order to comply with this chapter.
29 U.S.C. § 623(a).

factor in the employment decision at issue. *Billet v. CIGNA Corp.*, 940 F.2d 812, 816 (3d Cir.1991); *Bartek v. Urban Redevelopment Authority of Pittsburgh*, 882 F.2d 739, 742 (3d Cir.1989); *see Andersen v. Exxon Co., U.S.A.*, 89 N.J. 483, 493, 446 A.2d 486 (1982) (ultimate burden of persuasion is borne by the plaintiff). A plaintiff, however, is not required to prove "that age was the sole or exclusive reason, but rather that 'age made a difference' in the employer's decision." *Billet*, 940 F.2d at 816.

Age discrimination claims under both the ADEA and the NJLAD "are governed by the same standards of proof." *Lawrence*, 98 F.3d at 65. DeJoy's claims of employment discrimination, pursuant to ADEA and NJLAD, are governed by the burden shifting analysis enunciated in *McDonnell Douglas*, 411 U.S. 792, 93 S.Ct. 1817, refined in *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 252–53, 101 S.Ct. 1089, 1093–94, 67 L.Ed.2d 207 (1981) and recently clarified in *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993).[8] *Id.*; *see Johnson*, 949 F.Supp. at 1169–71; *Craig v. Suburban Cablevision, Inc.*, 140 N.J. 623, 631, 660 A.2d 505 (1995). Accordingly, DeJoy's age discrimination claims will be analyzed together.

■ Like other employment discrimination claims, claims under the ADEA can be established either by the presentation of direct evidence of discrimination under *Price Waterhouse v. Hopkins*, 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989), or from evidence which creates an inference of discrimination under the framework of *McDonnell Douglas–Burdine*. *See United States Postal Service Bd. of Governors v. Aikens*,

460 U.S. 711, 714 n. 3, 103 S.Ct. 1478, 1481 n. 3, 75 L.Ed.2d 403 (1983);[9] *Kralman v. Illinois Dep't of Veterans' Affairs*, 23 F.3d 150, 153 (7th Cir.), *cert. denied*, 513 U.S. 948, 115 S.Ct. 359, 130 L.Ed.2d 313 (1994). "Direct evidence of discrimination would be evidence which, if believed, would prove the existence of the fact in issue *without inference or presumption.*" *Torre v. Casio, Inc.*, 42 F.3d 825, 829 (3d Cir.1994) (emphasis in original; citations and internal punctuation omitted).

DeJoy has not come forward with any direct evidence to support his claims of age discrimination; a review of the submissions, moreover, reveals no such evidence. *Cf. Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 120, 105 S.Ct. 613, 621, 83 L.Ed.2d 523 (1985) (policy of defendant airline permitted pilots disqualified for any reason but age to transfer automatically to position of flight engineer; age-disqualified pilots were required to bid for available flight engineer positions and retire if bids were unsuccessful before their sixtieth birthdays).

As indicated, however, in the absence of direct evidence, a plaintiff may establish a *prima facie* case of age discrimination by way of circumstantial evidence. *Starceski v. Westinghouse Electric Corp.*, 54 F.3d 1089, 1095 n. 4 (3d Cir.1995); *Torre*, 42 F.3d at 829 (citing *McDonnell Douglas*, 411 U.S. 792, 93 S.Ct. 1817); *Andersen*, 89 N.J. at 492–93, 446 A.2d 486. In *McDonnell Douglas*, the Court set out a four-part framework for a plaintiff seeking to raise an inference of discrimination. 411 U.S. at 802, 93 S.Ct. at 1824.

■ Under *McDonnell Douglas*, a discharged employee must first prove a *prima facie* case of discrimination by a preponderance of the evidence. *Burdine*, 450 U.S. at

---

8. The New Jersey Supreme Court has adopted the *McDonnell Douglas–Burdine* framework but has indicated the analysis "must be modified where appropriate." *Erickson v. Marsh & McLennan Co., Inc.*, 117 N.J. 539, 550, 569 A.2d 793 (1990); *see McKenna*, 32 F.3d at 827; *Johnson v. Penske Truck Leasing Co.*, 949 F.Supp. 1153, 1169–70 (D.N.J.1996); *Grigoletti v. Ortho Pharmaceutical Corp.*, 118 N.J. 89, 97–98, 570 A.2d 903 (1990). In the instant case, however, the parties do not argue, and there does not appear to be any reason, for modifying the analysis with regard to DeJoy's NJLAD claim of age discrimination.

9. *Aikens* concerned a lawsuit filed under Title VII of the Civil Rights Act of 1964. 460 U.S. at 712, 103 S.Ct. at 1480. The evidentiary standards set out in Title VII cases are routinely applied to ADEA cases. *Armbruster v. Unisys Corp.*, 32 F.3d 768, 777 n. 10 (3d Cir.1994) (citing *Seman v. Coplay Cement Co.*, 26 F.3d 428, 432 n. 7 (3d Cir.1994); *Duffy v. Wheeling Pittsburgh Steel Corp.*, 738 F.2d 1393, 1396 (3d Cir.), *cert. denied*, 469 U.S. 1087, 105 S.Ct. 592, 83 L.Ed.2d 702 (1984)).

252–53, 101 S.Ct. at 1093–94. In order to establish a *prima facie* case of discrimination, DeJoy must prove by a preponderance of the evidence (1) he belongs to a protected class, (2) he was qualified for the Vice President and General Manager positions and/or the Area Vice President position, (3) he was not retained in the positions, despite being qualified, and (4) he ultimately was replaced by someone sufficiently younger to permit an inference of age discrimination. *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. at 1824; *Lawrence,* 98 F.3d at 65–66; *Waldron v. SL Industries, Inc.,* 56 F.3d 491, 494 (3d Cir. 1995); *Sempier v. Johnson & Higgins,* 45 F.3d 724, 728 (3d Cir.1995); *Billet,* 940 F.2d at 816 n. 3 (citing *Maxfield v. Sinclair Int'l,* 766 F.2d 788, 792 (3d Cir.1985), *cert. denied,* 474 U.S. 1057, 106 S.Ct. 796, 88 L.Ed.2d 773 (1986)); *Chipollini,* 814 F.2d at 897; *Andersen,* 89 N.J. at 492, 446 A.2d 486; *see Burdine,* 450 U.S. at 252–53, 101 S.Ct. at 1093–94.

Once established, a *prima facie* case creates a presumption of discriminatory intent by the defendant-employer. *Hicks,* 509 U.S. 502, 113 S.Ct. 2742; *see Burdine,* 450 U.S. at 254, 101 S.Ct. at 1094. While the ultimate burden of persuasion remains with the plaintiff, the burden of production shifts to the defendant-employer who must provide a legitimate justification for terminating the employee. *Hicks,* 509 U.S. at 507, 113 S.Ct. at 2747; *Burdine,* 450 U.S. at 254, 101 S.Ct. at 1094; *Lawrence,* 98 F.3d at 66; *Clowes v. Terminix Int'l, Inc.,* 109 N.J. 575, 596, 538 A.2d 794 (1988); *Andersen,* 89 N.J. at 492, 446 A.2d 486. "To accomplish this, the defendant must clearly set forth, through the introduction of admissible evidence, the reasons for the plaintiff's rejection." *Burdine,* 450 U.S. at 255, 101 S.Ct. at 1094. At this stage, "the defendant bears only the burden of explaining clearly the nondiscriminatory reasons for its actions." *Id.* at 260, 101 S.Ct. at 1097 (rejecting lower court decision holding defendant to a preponderance of the evidence standard). Once the employer satisfies this burden, the presumption raised by the *prima facie* case is "rebutted" and "drops from the case." *Burdine,* 450 U.S. at 255 & n. 10, 101 S.Ct. at 1094–95 & n. 10; *see Hicks,* 509 U.S. at 507, 113 S.Ct. at 2747.

A plaintiff-employee must then prove "that the employer's proffered reasons are pretextual." *Torre,* 42 F.3d at 829; *see Hicks,* 509 U.S. at 507–08, 113 S.Ct. at 2747–48; *Burdine,* 450 U.S. at 253, 101 S.Ct. at 1093–94; *Andersen,* 89 N.J. at 492, 446 A.2d 486.

At the summary judgment phase, "a plaintiff may defeat a summary judgment motion either (1) by discrediting the proffered reasons for termination, directly or circumstantially, or (2) by adducing evidence that discrimination was more likely than not a motivating or determinative cause of the adverse action." *Lawrence,* 98 F.3d at 66; *Sempier v. Johnson & Higgins,* 45 F.3d 724, 731 (3d Cir.), *cert. denied,* — U.S. ——, 115 S.Ct. 2611, 132 L.Ed.2d 854 (1995); *Fuentes v. Perskie,* 32 F.3d 759, 765 (3d Cir.1994).

"To discredit the employer's proffered reason[s], the plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether a *discriminatory animus* motivated the employer[.] ... Rather, the ... plaintiff must demonstrate such 'weaknesses, implausibilities, inconsistencies, incoherences, or contradictions in the employer's proffered legitimate reason[s] for its action that a reasonable factfinder could rationally find them unworthy of credence, and hence infer that the employer did not act for the asserted non-discriminatory reasons.'" *Brewer v. Quaker State Oil Refining Corp.,* 72 F.3d 326, 331 (3d Cir.1995) (quoting *Fuentes,* 32 F.3d at 765); *see Waldron,* 56 F.3d at 495 (rejecting "pretext-plus" standard under which a plaintiff would have to show defendant's reasons were false and the real reason for the employment action was discriminatory).

Once the plaintiff points to evidence sufficient to discredit the defendant's proffered reasons, the plaintiff need not also come forward with additional evidence of discrimination beyond his or her *prima facie* case to survive a summary judgment motion by the defendant. *Brewer,* 72 F.3d at 331; *Waldron,* 56 F.3d at 495.

Curiously, Defendants do not address the *McDonnell Douglas–Burdine* analysis in the

Moving Brief. Instead, Defendants rely upon a conclusory argument that DeJoy is unable to sustain his burden of proof because he has "failed to adduce any evidence" of age discrimination and an argument that DeJoy should be judicially estopped from pursuing his age discrimination claims because of inconsistent statements. Moving Brief at 16.

### 1. Burden of Proof

█ DeJoy has made out a *prima facie* case of age discrimination. There is no dispute that DeJoy is in the protected class; at the time of the alleged discrimination, DeJoy was fifty-six years old. *See* 29 U.S.C. § 631. Additionally, there appears to be no dispute that DeJoy was qualified for the position; as indicated, DeJoy held the position of Vice President and General Manager of Suburban Cablevision, prior to the alleged discrimination. Finally, DeJoy, despite being qualified, has been replaced by two younger men. Defendants, moreover, concede, for the purposes of the instant motion, that DeJoy has established a *prima facie* case of age discrimination. *See* Reply at 2 n. 2.

As explained, because DeJoy has established a *prima facie* case of age discrimination, the burden of production shifts to Defendants to articulate legitimate, nondiscriminatory reasons for their failure to retain DeJoy as Vice President and General Manager of Suburban or appoint him to the position of Area Vice President.

As indicated, Defendants have not addressed the *McDonnell Douglas–Burdine* analysis in the Moving Brief. Defendants, moreover, have not articulated legitimate, nondiscriminatory reasons for their employment decisions concerning DeJoy in the Moving Brief.

After recognizing Defendants' failure to set forth any legitimate, nondiscriminatory reasons for their employment decisions in the Moving Brief, DeJoy addressed the reasons for the decisions, given by Doyle during his deposition:

(1) DeJoy made two inappropriate comments at a dinner on September 1, 1994; (2) DeJoy was uncooperative with Peddrick regarding executive salary information; (3) DeJoy failed to show the cash flow goals Doyle expressed to DeJoy at a budget presentation in Toronto in November 1994; and (4) DeJoy exercised poor judgment in calling Doyle numerous times to discuss issues which Doyle told DeJoy Comcast [Cable] could not address prior to closing. Opposition Brief at 10–11; *see id.* at 5.[10]

DeJoy argues the reasons given by Doyle during discovery were pretextual. Opposition Brief at 11–14. DeJoy argues he never made one of the two allegedly inappropriate comments and that Doyle misrepresents the second, which was intended and was received as humorous. Opposition Brief at 11. DeJoy further points out that he continued in his position for three months after these allegedly inappropriate comments were made and that "nothing was said to either DeJoy or anyone else at Maclean–Hunter regarding [DeJoy's] allegedly offensive comments." *Id.*

Finally, DeJoy observes Defendants offered him the position of Director of Business Development after he allegedly made the offensive comments. Opposition Brief at 11. As indicated, the major duties of the position Director of Business Development, according to the job description prepared by Doyle, included "[m]aintain[ing] consistent visitation with community leaders to promote strong community relationships." Moving Brief, Exh. I. According to the job description, moreover, DeJoy would have been responsible, as Director of Business Development, for managing Comcast Cable's interactive businesses, once they were constructed. *Id.* The argument is that removing Doyle from his position as Vice President and General Manager of Suburban Cablevision because of his alleged inappropriate comments appears inconsistent with offering him a position that requires DeJoy to interact with community leaders and manage newly developed businesses.

---

**10.** Defendants argue DeJoy "mistates and mischaracterizes Defendants' legitimate and nondiscriminatory reasons for removing him." Reply Brief at 3 n. 3. As will be discussed, Defendants' argument is without merit. Defendants failed to set forth their alleged "legitimate and nondiscriminatory reasons" in the Moving Brief.

DeJoy argues "[t]here are genuine issues of material fact as to whether the other events cited by Doyle even occurred." Opposition Brief at 12. For example, DeJoy argues that neither he nor any Suburban Cablevision manager was informed by Doyle about Comcast Cable's cash flow goals. *Id.* (citing DeJoy Dep. at 375; Albarella Dep. at 129). Accordingly, DeJoy "could not plausibly have expressed to Doyle that such goals could not be met." *Id.*

DeJoy argues "there is not a single document to corroborate the claim that Peddrick had difficulty obtaining executive salary information...." Opposition Brief at 13. DeJoy argues, moreover, he was not authorized to release salary information, prior to closing. *Id.*

DeJoy asserts that Defendants' argument that DeJoy inappropriately contacted and requested information from Doyle is inconsistent with Comcast Cable's own actions prior to closing. Opposition Brief at 12–13. As indicated, Defendants held employee meetings on 2 December 1994 to introduce themselves to the employees of Suburban Cablevision and Jersey City Cable, prior to the 22 December 1994 closing. Defendants also attended the budget presentation, held in November 1994. Doyle Dep. at 55–59. Accordingly, DeJoy argues, Defendants' activities prior to closing are inconsistent with their removal of DeJoy from his position because of his allegedly inappropriate questions. Moving Brief at 13.

Finally, DeJoy argues the position of Director of Business Development was a *"post hoc* fabrication." Moving Brief at 13. As indicated, the Director of Business Development position does not appear on the table of organization for Suburban Cablevision published on 24 March 1995. *Id.;* Blunda Cert., Exh. R. DeJoy argues that "[d]espite the alleged 'importance' and 'critical' nature of this position, Comcast [Cable] has not hired any one individual to perform this job." *Id.* (citing Fischer Dep. at 159).

In the Reply Brief, Defendants, for the first time, set forth their alleged legitimate, nondiscriminatory reasons for removing DeJoy as Vice President and General Manager of Suburban Cablevision. Reply at 3. Defendants argue:

(1) At a September 1, 1994 "get acquainted" meeting with Comcast [Cable] ... DeJoy made two lewd and inappropriate comments ...; (2) ... DeJoy told ... Doyle that Suburban Cablevision was running as tightly as it could be run and that there was no room for cash flow growth ...; (3) At the Suburban Cablevision budget presentation in Toronto, ... DeJoy did not present a budget, he showed pictures of ... Patterson juxtaposed on a muscle man's body and the budget showed a negative cash flow growth for the cable system ... (4) During a meeting with ... DeJoy, he belittled a Comcast [Cable] executive, David Brindinger ...; (5) ... DeJoy was very difficult to work with regarding salary information of Suburban Cablevision Managers ... (6) ... DeJoy frequently contacted ... Doyle about the same issues requesting decisions from Comcast [Cable], which did not yet own Suburban Cablevision, and ... [DeJoy] would not accept the answer that Comcast [Cable] could not make any decisions until they owned the property ... (7) Comcast [Cable] had the opportunity to hire ... Fischer who had more than 19 years experience in cable television as a government regulator, community relations specialist, and local/regional Chief Operating Officer. In addition, ... Fischer has a law degree.... Doyle and ... Baxter had worked with ... Fischer in the past and were impressed with his qualifications.

Reply Brief at 3–4. Defendants fault DeJoy for failing to address "reasons (4), (5) and (7)." *Id.* at 4.

As indicated, Defendants bear the burden of demonstrating there exist "no genuine issue as to any material fact and that [they are] entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Celotex,* 477 U.S. at 322, 106 S.Ct. at 2552. Because DeJoy has established a *prima facie* case of age discrimination, Defendants are required to set forth articulate legitimate, nondiscriminatory reasons for their actions. *Burdine,* 450 U.S. at 253, 101 S.Ct. at 1093–94. "To accomplish this, [Defendants] must clearly set forth

through the introduction of admissible evidence the reasons for [DeJoy's] rejection." *Burdine,* 450 U.S. at 255, 101 S.Ct. at 1094. Defendants have failed to meet their burden of production; as indicated, Defendants did not set forth any of their alleged legitimate, nondiscriminatory reasons for DeJoy's removal in the Moving Brief. Defendants' failure to set forth their alleged legitimate, nondiscriminatory reasons in the Moving Brief denied DeJoy his " 'full and fair opportunity' to prove pretext." *Burdine,* 450 U.S. at 258, 101 S.Ct. at 1096.

DeJoy, moreover, has cast "substantial doubt" on the proffered reasons he was able to glean from the evidence in the instant case. *See Fuentes,* 32 F.3d at 764. Contrary to Defendants' argument, *see* Reply at 4, DeJoy will not be faulted for failing to anticipate all of Defendants' proffered reasons.

Based upon the foregoing, it appears genuine issues of material fact preclude the entry of summary judgment with regard to DeJoy's age discrimination claims. Defendants have not met their burden of coming forward with legitimate, nondiscriminatory reasons for their actions. Furthermore, if a jury were to accept DeJoy's evidence and his interpretation of that evidence, it could determine that Defendants' proffered nondiscriminatory reasons for removing him from his position were pretextual and that Defendants discriminated against him because of his age. *See Torre,* 42 F.3d at 833. Accordingly, summary judgment is inappropriate. *Fuentes,* 32 F.3d at 764.

### 2. *Judicial Estoppel*

As indicated, Defendants argue DeJoy's allegations and statements "are completely inconsistent with [a claim for age discrimination] and ... DeJoy should therefore be judicially estopped from pursuing his age discrimination claims." Moving Brief at 16 (citing *McNemar v. Disney Store, Inc.,* 91 F.3d 610 (3d Cir.1996), *cert. denied,* — U.S. ——, 117 S.Ct. 958, 136 L.Ed.2d 845 (1997)).

 "The doctrine of judicial estoppel serves a consistently clear and undisputed jurisprudential purpose: to protect the integrity of the courts." *McNemar,* 91 F.3d at 616. Judicial estoppel is an equitable doctrine that a court, in its discretion, may invoke to protect the integrity of the judicial process. *Id.* at 617. "Judicial estoppel is intended to prevent parties from playing fast and loose with the courts by asserting inconsistent positions." *Ryan Operations G.P. v. Santiam–Midwest Lumber Co.,* 81 F.3d 355, 361 (3d Cir.1996); *see McNemar,* 91 F.3d at 617; *EF Operating Corp. v. American Buildings,* 993 F.2d 1046, 1050 (3d Cir.), *cert. denied,* 510 U.S. 868, 114 S.Ct. 193, 126 L.Ed.2d 151 (1993).

Judicial estoppel is "factually driven." *McNemar,* 91 F.3d at 613. As the *McNemar* court held:

> [J]udicial estoppel is an equitable doctrine, invoked by a court in its discretion (1) to preserve the integrity of the judicial system by preventing parties from playing fast and loose with the courts in assuming inconsistent positions, and (2) with a recognition that each case must be decided on its own particular facts and circumstances.

91 F.3d at 617.

 Defendants argue DeJoy's statements in both his EEOC Affidavit and his answers to the court's interrogatories are inconsistent with a claim that Defendants engaged in age discrimination. Moving Brief at 14. In response to an interrogatory asking DeJoy to "[s]tate with particularity what [he] contend[s] the [D]efendant[s] did, or failed to do, which entitles you to obtain relief you seek in this action[,]" DeJoy stated, in relevant part:

> It is clear that as of December 7, 1994, [DeJoy] was the designated Area Vice President in good standing and that on December 12, 1994, he was replaced *because of his illness and perceived disability.* He was replaced by *a younger, less experienced person.*
>
> The position of Area Vice President was awarded to ... Fischer *who is approximately ten years younger than [DeJoy]* and who had been recently hired by Comcast [Cable].... Doyle and ... Fischer subsequently appointed a new Vice President and General Manager of Suburban

Cablevision, *who is approximately fifteen years younger than [DeJoy]* ....

Plaintiff challenged Defendants' actions in removing him from his position and asserted that the Defendants' conduct violated the representations made to him and many others and that he had been removed from his position *on the basis of his age and disability.*

Moving Brief, Exh. O (emphasis added). DeJoy included a similar statement in the affidavit submitted to the EEOC. *Id.,* Exh. N.

There is no basis to invoke judicial estoppel over DeJoy's age discrimination claims. DeJoy's allegations in the Amended Complaint, his submissions to the EEOC and his answers to the court ordered interrogatories are consistent with a claim of age discrimination. *Compare McNemar,* 91 F.3d at 618 (plaintiff's prior sworn statements that he was "totally disabled" were found inconsistent with his allegation in ADA action that he was qualified for employment). DeJoy's allegations that Defendants discriminated against him because he was disabled are not inconsistent with his age discrimination claim; a party may seek "[r]elief in the alternative or of several different types...." Fed.R.Civ.P. 8(a). Accordingly, it would be inappropriate to exercise the court's discretion to dismiss DeJoy's age discrimination claims based upon the doctrine of judicial estoppel.

### C. *Handicap Discrimination*

As indicated, DeJoy alleges Defendants violated the ADA and the NJLAD by discriminating against him on account of his heart condition.

The ADA proscribes "discrimination against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement or discharge of employees, employee compensation, job training and other terms, conditions and privileges of employment." 42 U.S.C. § 12112(a). The term "qualified individual with a disability" means a person who, with or without "reasonable accommodation," can perform the essential functions of the employment position that person holds or seeks. 42 U.S.C. § 12111(8).

The NJLAD similarly prohibits unlawful discrimination because of a person's "handicap." *See* N.J.S.A. 10:5–4.1 and 10:5–29.1; *Lawrence,* 98 F.3d at 68.

■■■ As with DeJoy's claim of age discrimination, to establish a *prima facie* case of handicap discrimination, DeJoy must prove by a preponderance of the evidence that (1) he belongs to a protected class, (2) he was qualified for the position, (3) he was dismissed despite being qualified and (4) he was ultimately replaced by a person sufficiently outside the protected class to create an inference of discrimination. *See Lawrence,* 98 F.3d at 68; *Sempier,* 45 F.3d at 728; *Chipollini,* 814 F.2d at 897; *Clowes,* 109 N.J. at 596–97, 538 A.2d 794.

At issue in the instant case is whether DeJoy is within the protected class. *See* Moving Brief at 17.

The ADA defines "disability" to mean:

(A) a physical or mental impairment that substantially limits one or more of the major life activities of ... [an] individual; (B) a record of such an impairment; or (C) *being regarded as having such an impairment.*

42 U.S.C. § 12101(2) (emphasis added). Major life activities include activities such as "caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working." 29 C.F.R. § 1630.2(i). To be considered "substantially limit[ed]" in a major life activity, a plaintiff must be significantly restricted in the performance of the activity, compared to the average person. 29 C.F.R. § 1630.2(j).

■■■ The ADA does not apply to "transient, nonpermanent condition[s]." *McDonald v. Com. of Pa., Dep't of Public Welfare,* 62 F.3d 92, 97 (3d Cir.1995). Temporary medical conditions do not constitute disabilities under the ADA. *Id.*

In *McDonald,* the plaintiff, a probationary employee, "became disabled because of severe abdominal pain." 62 F.3d at 94. She requested that she be placed on unpaid sick leave for a less than two month period, "after which her physician reported that she could return to work." *Id.* Her employer denied

her request because "she was still a probationary employee and, under the terms of the collective bargaining agreement, was not eligible for extended sick leave." *Id.* The plaintiff was subsequently discharged because of her inability to attend to her duties. *Id.*

The district court in *McDonald* concluded the plaintiff failed to state a claim under the ADA; the Circuit affirmed and held:

> [I]t is clear that the plaintiff in the case before us cannot qualify for relief under the [ADA].... As the complaint reveals, her inability to work caused by the surgery was of limited duration. She entered the hospital on December 25, 1992, and would have been able to return to her duties ... on February 15, 1993, a period of less than two months. Although she was incapacitated for these weeks, her inability to work was not permanent, nor for such an extended time as to be of the type contemplated by the [ADA].

*McDonald,* 62 F.3d at 96. In the instant case, it is not disputed DeJoy recovered from his heart condition and was able to return to work within approximately four to five months. *See* Opposition Brief at 20; DeJoy 12G Statement, ¶ 39.[11]

The instant case, however, differs from *McDonald* in several significant manners. First, DeJoy's period of incapacitation was significantly longer than the plaintiff in *McDonald.* Second, DeJoy's condition appears to have been more serious than the plaintiff in *McDonald.*[12] Third, and most important-

---

**11.** In his Rule 12G statement, DeJoy states that his physician did not release him to return to work until 23 May 1995. DeJoy 12G Statement, ¶ 39 (citing Bahler Dep. at 50–51). In the Opposition Brief, DeJoy states that he was cleared to return to work in "mid-April 1995." Opposition Brief at 20 (citing Bahler Dep. at 49).

**12.** There is no indication in *McDonald* that the plaintiff's condition was life threatening. *See McDonald,* 62 F.3d at 96. As indicated, in the instant case, DeJoy suffered a ruptured aortic aneurism and was hospitalized in critical condition. DeJoy's condition was life threatening; his physician testified that "between 100 to 90 percent of the people who come in to the emergency room in his condition die." Bahler Dep. at 14–15. Even after undergoing surgery, DeJoy's chances of dying were 60 percent. *Id.* at 15.

**13.** N.J.S.A. 10:5–5(q) provides:

ly, DeJoy alleges he was discriminated against because Defendants perceived him to be disabled. Amended Complaint, ¶ 52 ("Defendants ... perceived and treated [DeJoy] as disabled.").

The NJLAD defines "handicap" as a "physical disability, infirmity, malformation or disfigurement which is caused by bodily injury, birth defect or illness...." N.J.S.A. 10:5–5(q).[13] The statutory definition of "handicapped," N.J.S.A. 10:5–5(q), is broad in scope. *Clowes,* 109 N.J. at 593, 538 A.2d 794. Under this "broad" definition, unlike under the ADA, a plaintiff need not demonstrate "substantial impairment with a major life activity" in order to establish the first element of a *prima facie* case. *Id.; see Gimello v. Agency Rent–A–Car Systems,* 250 N.J.Super. 338, 358–61, 594 A.2d 264 (App.Div. 1991). With few exceptions, none of which is relevant in the instant case, NJLAD does not define the specific conditions that fall within its scope.

In *Panettieri v. C.V. Hill Refrigeration,* 159 N.J.Super. 472, 388 A.2d 630 (1978), the Appellate Division found that an employee who had suffered a heart attack was handicapped under NJLAD. *Id.* at 493, 388 A.2d 630. In *Panettieri,* the plaintiff's treating physician "cleared him to return to his job[,] and the plaintiff's heart attack did not result in serious heart damage." *Id.*

Like the ADA, the NJLAD protects persons who have been discriminated against because of their handicap as well as persons

> "Handicapped" means suffering from physical disability, infirmity, malformation or disfigurement which is caused by bodily injury, birth defect or illness including epilepsy and which shall include, *but not be limited to,* any degree of paralysis, amputation, lack of physical coordination, blindness or visual impediment or physical reliance on a service or guide dog, wheelchair, or other remedial appliance or device, or from any mental, psychological or developmental disability resulting from anatomical, psychological, physiological or neurological conditions which prevents the normal exercise of any bodily or mental functions or is demonstrable, medically or psychologically, by accepted clinical or laboratory diagnostic techniques. Handicapped shall also mean suffering from AIDS or HIV infection.
>
> *Id.* (emphasis added).

who are discriminated against because they are perceived as handicapped. *See* N.J.S.A. 13:13–1.3(1) (prohibiting discrimination "[b]ecause of a perception or belief that an individual suffers from a handicap," whether the person is actually handicapped); *Gimello*, 250 N.J.Super. at 363–65, 594 A.2d 264; *Poff v. Caro*, 228 N.J.Super. 370, 377, 549 A.2d 900 (Law Div.1987); *Rogers v. Campbell Foundry*, 185 N.J.Super. 109, 112, 447 A.2d 589 (App.Div.), *cert. denied*, 91 N.J. 529, 453 A.2d 852 (1982); *see Andersen*, 89 N.J. at 495 n. 2, 446 A.2d 486. The New Jersey Supreme Court has observed: "'[P]rejudice in the sense of a judgment or opinion formed before the facts are known is the fountainhead of discrimination engulfing medical disabilities which prove on examination to be ... nonexistent.'" *Andersen*, 89 N.J. at 495 n. 2, 446 A.2d 486. (quoting *Barnes v. Washington Natural Gas Co.*, 22 Wash.App. 576, 582, 591 P.2d 461 (Wash.Ct.App.1979)).

█ Defendants argue the "evidence demonstrates that after recovering from his surgery, [DeJoy] did not suffer from any impairment, physical disability, infirmity, malformation or disfigurement within the meaning of the ADA or the NJLAD." Moving Brief at 20. Defendants further argue the "evidence also demonstrates that [DeJoy] was not perceived or regarded as being disabled or handicapped." *Id.* at 21. Defendants argue:

> On December 9, 1994, the day after [DeJoy's] aneurism, Defendants were informed that [DeJoy] was expected to fully recover within two to three months.... More importantly all of Defendants' conduct after [DeJoy] became ill supports the conclusion that they did not regard him as being disabled. On January 11, 1995, when [DeJoy] was informed that he would no longer be Vice President and General Manager of Suburban, Defendants offered [DeJoy] an alternative job.... On Janu-

ary 16, 1995, Defendants issued a memorandum to all employees from ... Doyle in which it was stated that Comcast [Cable] had offered a position to ... DeJoy and that ... DeJoy was considering the position and would let Comcast [Cable] know his answer when he was ready to return.... On January 24, 1995, Comcast [Cable] sent ... DeJoy a job description for the job offered to him.... In a letter to ... Peddrick, Vice President of Human Resources of Comcast Cable Division, on February 8, 1996, ... DeJoy stated, "according to my doctor, I am progressing nicely." ... Thus, there is simply no record evidence that Comcast [Cable] regarded ... DeJoy as having a substantially limiting impairment or any other impairment.

Moving Brief at 23 (citations omitted).

DeJoy responds that the timing of Defendants' actions "raises an inference that [D]efendants perceived DeJoy to be disabled...." Opposition Brief at 20. DeJoy further argues the evidence establishes "he was actually disabled and perceived to be disabled by [D]efendants, thereby making out a *prima facie* case of disability/handicap discrimination under both the ADA and [NJ]LAD." *Id.* at 21.

As indicated, DeJoy suffered from a severe medical problem and was unable to return to work for four to five months. There is no indication that after his return to work, DeJoy was limited by his medical condition in any manner. In retrospect, DeJoy appears to have suffered from a medical condition of limited duration. Accordingly, he does not appear to have been "disabled" under the ADA. *See McDonald*, 62 F.3d at 96.[14]

Defendants, however, are not entitled to summary judgment with respect to DeJoy's claims of discrimination based upon his alleged disability or handicap. As indicated, DeJoy alleges Defendants discriminated

---

14. Defendants have not established that DeJoy did not suffer a "handicap" within the protection of the NJLAD. As indicated, the NJLAD definition of handicap is broader than the definition of disability under the ADA. The protection of NJLAD applies to "any unlawful discrimination against any person because such person is or *has been at any time* handicapped...." N.J.S.A. 10:5–4.1 (emphasis added). It is not necessary to determine whether DeJoy's temporary condition may constitute a "handicap" under NJLAD; as will be discussed, genuine issues of material fact remain whether Defendants perceived DeJoy to be handicapped at the time they made the employment decisions at issue.

against him because of his "disability and/or [their] *perception*" that he was disabled. Amended Complaint, ¶ 54 (emphasis added); *see id.,* ¶ 62 ("Defendants have discriminated against [DeJoy] in regard to his employment, compensation, and terms and conditions of employment because of his disability *or his perceived disability,* in violation of NJLAD.") (emphasis added). Genuine issues of material fact remain unresolved as to whether Defendants perceived that DeJoy suffered from a disability covered by either the ADA or NJLAD at the time they made their employment decision.

After DeJoy suffered his ruptured aortic aneurysm, and while he was recuperating, Doyle and Peddrick met with Paul Gillert ("Gillert"), the head of Human Resources for Comcast Cable, and Dr. Richard Petrino, a consultant. Doyle Dep. at 38. The purpose of the meeting was "to discuss the providing of information of ... DeJoy's new job offer and the announcement of ... Fischer," as the new Area Vice President. *Id.* Doyle states that Gillert was invited to attend the meeting because of the "sensitivity of [the] particular issue...." *Id.* at 41.

It is undisputed that the position of Director of Business Development did not exist at the time it was offered to DeJoy. Doyle Dep. at 86. The position, moreover, did not appear in the Suburban Cablevision and Cable TV of Jersey City table of organization, published on 24 March 1995. Blunda Cert., Exh. R. Furthermore, the position has never been filled. Fischer Dep. at 159–62.

When DeJoy was offered the position of Director of Business Development, the Job Description had not been prepared. The Job Description, forwarded to him on 24 January 1994, lacked specifics and was phrased in broad and general terms. *See* Moving Brief, Exh. I. Based upon the evidence presented, it appears that a genuine issue of material fact exists as to whether the Director of Business Development position was a fabrication, offered to DeJoy to avoid a law suit. *See Torre,* 42 F.3d at 834.

In *Torre,* a fifty-two year old plaintiff sued his former employer under the ADEA after he was transferred to a new position and then terminated during a reduction in force. 42 F.3d at 828. The Circuit reversed the district court's grant of summary judgment in favor of the defendant, in part, because the plaintiff provided sufficient evidence upon which a reasonable jury could conclude that the plaintiff was being set up for termination when he was transferred to a job that did not exist. *Id.* at 835.

In the instant case, DeJoy has similarly provided sufficient evidence upon which a reasonable jury could conclude the Director of Business Development was a sham position. Accordingly, while a jury could rationally accept Defendants' argument that their offer of the position to DeJoy indicated they did not consider him disabled, a jury could also rationally conclude the position was a fabrication, indicating a discriminatory intent on the part of Defendants. *See Torre,* 42 F.3d at 835.

The timing of Defendants' decision to remove DeJoy from his position as Area Vice President and General Manager similarly precludes summary judgment. As indicated, on 2 December 1994, during a meeting for employees of Suburban Cablevision and Cable Television of Jersey City, Doyle represented that DeJoy would continue in his position. *See* Albarella Dep. at 75–76; Bucci Dep. at 109–113; *see also* Doyle Dep. at 212–13. On 8 December 1994, DeJoy suffered his ruptured aortic aneurysm. Bahler Dep. at 6. Bucci states that in January of 1995, Peddrick told her the decision to replace DeJoy had been made on 12 December 1994. Bucci Dep. at 138–39.[15] On 11 January 1995, while still recuperating, DeJoy was informed he would be replaced. DeJoy Dep. at 464. The timing of Defendants' decision to remove DeJoy from the position of Area Vice President and General Manager, which according to Bucci was reached four days after DeJoy's aneurysm ruptured, may raise an inference that Defendants perceived DeJoy as disabled. *See Josey v. John R. Hollingsworth*

---

15. Doyle states that the decision to remove DeJoy had been reached in November 1994. Doyle Dep. at 72–73.

*Corp.,* 996 F.2d 632, 639–41 (3d Cir.1993) (timing of adverse employment action may raise an inference of discriminatory animus); *White v. Westinghouse Elec. Co.,* 862 F.2d 56, 62 (3d Cir.1988). Because genuine issues of material fact remain unresolved as to whether Defendants perceived DeJoy as suffering from disability, as defined in the ADA, or a handicap, as defined in NJLAD, summary judgment is not appropriate as to counts III and IV.

### D. *Retaliation*

As indicated, Defendants argue DeJoy cannot establish a *prima facie* case of retaliation under the NJLAD, the ADA or the ADEA. Moving Brief at 24. Both the ADA and the ADEA make it unlawful for an employer to discriminate against an employee because of the employees' protected conduct. 29 U.S.C. § 623(d); 42 U.S.C. § 12203(a). NJLAD makes it unlawful "[f]or any person to take reprisals against any person because he [or she] has opposed any practices or acts forbidden [under NJLAD] . . . or because he [or she] has filed a complaint, testified or assisted in any proceeding [under NJLAD]." N.J.S.A. 10:5–12(d).

■ To establish a *prima facie* case of retaliation under either the ADA, ADEA or NJLAD, DeJoy must show (1) that he engaged in protected conduct, (2) that he was subject to an adverse employment action subsequent to such activity, and (3) that a causal link exists between the protected activity and the adverse action. *Delli Santi v. CNA Ins. Companies,* 88 F.3d 192, 198 (3d Cir.1996); *Barber v. CSX Distrib. Servs.,* 68 F.3d 694, 701 (3d Cir.1995); *Jalil v. Avdel Corp.,* 873 F.2d 701, 708 (3d Cir.1989), *cert. denied,* 493 U.S. 1023, 110 S.Ct. 725, 107 L.Ed.2d 745 (1990); *see Lawrence,* 98 F.3d at 71 (citing *Romano v. Brown & Williamson Tobacco Corp.,* 284 N.J.Super. 543, 665 A.2d 1139 (App.Div.1995)).

■ A formal letter of complaint to an employer or the EEOC are not the only acceptable indicia of "protected conduct." *Barber,* 68 F.3d at 702. Informal protests of discrimination to management may qualify as protected activity as well. *Id.* (citing *Sum-*

*ner v. United States Postal Serv.,* 899 F.2d 203, 209 (2d Cir.1990)).

■ As indicated, on 8 December 1994, DeJoy suffered his aortic aneurysm. On 11 January 1995, DeJoy was informed he was being replaced by Fischer. By a letter, dated 31 March 1995, DeJoy was informed he would be removed from salary status and was required to file a claim for long term insurance benefits. Moving Brief, Exh. K.

On 3 April 1995, DeJoy protested his removal from salary status to Peddrick. Blunda Cert., Exh. U. In his protest, DeJoy relied upon his unofficial practice of paying managers full salary for up to one year in the event they had a serious illness as well as the Full Pay Memorandum. *Id.* DeJoy told Peddrick he felt it was illegal for Comcast Cable to take him off salary status. *Id.* Significantly, however, DeJoy did not complain to Peddrick of illegal discrimination. *Id.*

DeJoy first complained to Defendants of illegal discrimination in a 19 April 1995 letter from his attorney. DeJoy Dep. at 625. Although DeJoy had previously indicated to Defendants that he objected to his removal as Vice President and General Manager, the 19 April 1995 Letter was the first time he asserted Defendants' actions were discriminatory. *Id.* Accordingly, 19 April 1995 was the first time DeJoy engaged in protected activity. *Barber,* 68 F.3d at 702.

In *Barber,* the plaintiff wrote a letter of complaint to his employer complaining that a position he had applied for had been awarded to a "less qualified individual." 68 F.3d at 697. The plaintiff was later discharged from employment. *Id.* The district court "concluded that [plaintiff] failed to establish a *prima facie* case of retaliation because he did not demonstrate 'that he engaged in protected conduct.'" *Id.* at 701. The Circuit affirmed, holding that the plaintiff's "letter was just too vague to support a finding that his job was eliminated because he engaged in behavior that was protected under the ADEA." *Id.* at 702.

In the instant case, DeJoy's actions and statements, prior to 19 April 1995, were similarly too vague to be considered "protected conduct." As indicated, DeJoy must demon-

strate he was subject to an adverse employment action subsequent to his engaging in protected activity. *Barber,* 68 F.3d 694, 701. DeJoy has failed to demonstrate any retaliatory action taken against him after 19 April 1995. *See* Opposition Brief at 24–25. Accordingly, DeJoy's claims of retaliation, contained in count V of the Amended Complaint, are dismissed.

### E. *Breach of Contract*

DeJoy alleges that in 1994, an agreement was formed under which he "would remain Vice–President and General Manager of Suburban Cablevision and would be appointed Area Vice–President of Comcast [Cable] if [he] would agree to remain with Comcast [Cable] when it acquired the Suburban properties from Maclean–Hunter." Amended Complaint, ¶ 88. DeJoy does not allege the existence of a written contract of employment. A review of the record reveals that no such written contract exists. Instead, DeJoy apparently relies upon the oral representations made by Defendants. *See* Opposition Brief at 32–33. Significantly, DeJoy does not argue that Defendants agreed that he would retain his position for any definite period of time or that he would be discharged only for good cause.

■ Under New Jersey law, an employment contract for an indefinite duration creates an at will employment relationship which is terminable at any time and for any reason by either party. *Pitak v. Bell Atlantic Network Servs., Inc.,* 928 F.Supp. 1354, 1369 (D.N.J.1996); *Obendorfer v. Gitano Group, Inc.,* 838 F.Supp. 950, 952–53 (D.N.J. 1993).

The Supreme Court of New Jersey set out the prevailing "at will" employment rule in *Savarese v. Pyrene Mfg. Co.,* 9 N.J. 595, 89 A.2d 237 (1952). *Savarese* held:

> [I]n the absence of additional express or implied stipulations as to duration, a contract for permanent employment, for life employment or for other terms purporting permanent employment, where the employee furnishes no consideration additional to the services incident to the employment, amounts to an indefinite general hiring terminable at the will of either party, and therefore, a discharge without cause does not constitute a breach of contract justifying recovery of money damages therefor.

*Id.* at 600–01, 89 A.2d 237 (citations and quotations omitted). The Supreme Court of New Jersey reaffirmed the *Savarese* rule in *Shebar v. Sanyo Business Systems Corp.,* 111 N.J. 276, 544 A.2d 377 (1988). *See Obendorfer,* 838 F.Supp. at 953 (quoting *Savarese,* 9 N.J. at 600–01, 89 A.2d 237).

■ DeJoy, at best, was told he would remain in his position for the indefinite future. DeJoy does not argue otherwise. *See* Opposition Brief at 32–33. DeJoy remained an at will employee; accordingly, count VIII of the Amended Complaint is dismissed.

■ As indicated, DeJoy also alleges Defendants breached an implied covenant of good faith and fair dealing. In the absence of a contract there is no implied obligation of good faith and fair dealing. *Varrallo v. Hammond Inc.,* 94 F.3d 842, 848 (3d Cir. 1996) (covenant of good faith and fair dealing does exist in at will employment relationship); *see Obendorfer,* 838 F.Supp. at 954 (citing *Noye v. Hoffmann–La Roche, Inc.,* 238 N.J.Super. 430, 570 A.2d 12 (App.Div.), *cert. denied,* 122 N.J. 146, 584 A.2d 218 (1990)).

■ Under New Jersey law, however, an implied obligation of good faith is applicable to those aspects of an at will employment relationship that are governed by some contractual terms. *Peck v. Imedia, Inc.,* 293 N.J.Super. 151, 168, 679 A.2d 745 (App.Div.), *cert. denied,* 147 N.J. 262, 686 A.2d 763 (1996).

■ DeJoy's reliance upon the Full Pay Memorandum as a "contract term" of his employment relationship, Opposition Brief at 32–33, is misplaced. DeJoy has not shown any consideration on his part for the unilateral action of Patterson in approving the Full Pay Memorandum. *Cf. Shebar,* 111 N.J. at 288, 544 A.2d 377 ("[A] fact finder could conclude that plaintiff gave valuable consideration for [the employer's] promise of continued employment. . . ."). The Full Pay Memorandum was approved by Patterson

two days before Comcast Cable closed on its acquisition of Suburban Cablevision; Patterson testified, moreover, he did not inform Defendants of his approval of the Full Pay Memorandum. Patterson Dep. at 164–72.[16]

 Summary judgment, however, is not appropriate on DeJoy's breach of an implied covenant of good faith and fair dealing claim. Defendants have not established their alleged actions do not give rise to such a claim. *See Peck,* 293 N.J.Super. at 158, 679 A.2d 745.

In *Peck,* an employee sued her employer for allegedly rescinding an offer of full time employment after she had relocated from Boston to New Jersey to accept the offer. 293 N.J.Super. at 158, 679 A.2d 745. The offer was for at will employment. *Id.* at 167, 679 A.2d 745. The plaintiff alleged, among other things, that the defendants "did not act fairly in communicating their decision to rescind the job offer while they wanted her to complete work for an independent contractor. She contend[ed] that during that period she continued to advise clients in Boston of her decision to close her business there and prepared to move to New Jersey in the absence of being told of defendants' decision." *Id.* at 167, 679 A.2d 745.

The *Peck* court held that "[i]n these circumstances permitting plaintiff to prove such damages is consistent with [the] traditional notion of 'good faith and fair dealing,' even though the contract was itself terminable at will." *Peck,* 293 N.J.Super. at 168, 679 A.2d 745.

In the instant case, DeJoy alleges Doyle assured him that he would remain in his position after Comcast Cable acquired Suburban Cablevision. Amended Complaint,

¶ 19. DeJoy states that on 2 December 1994, Doyle specifically represented that DeJoy would remain Area Vice President and General Manager. DeJoy Dep. at 420. As indicated, Doyle states that the decision to replace DeJoy was made in November of 1994. Doyle Dep. at 55, 72. Accordingly, a genuine issue of material fact remains as to whether Defendants' actions breached an implied obligation of good faith and fair dealing, precluding summary judgment. *Peck,* 293 N.J.Super. at 168, 679 A.2d 745.

### F. *Promissory Estoppel*

 As indicated, DeJoy alleges defendants "are prohibited under the [d]octrine of [p]romissory [e]stoppel from avoiding their obligations to [DeJoy]." Amended Complaint, ¶ 93. The purpose of the doctrine of promissory estoppel is to compensate a party who has reasonably relied upon the promise of another, although all the elements of a breach-of-contract claim, such as mutual consideration, cannot be established. *Pitak,* 928 F.Supp. at 1368; *Leonardis v. Burns Int'l Sec. Svcs., Inc.,* 808 F.Supp. 1165, 1182 (D.N.J.1992). The elements of promissory estoppel are (1) a clear and definite promise by the promisor, (2) the promise must be made with the expectation that it will induce reliance by the promisee, (3) the promisee must reasonably rely upon the promise, and (4) the promisee must experience detriment of a definite and substantial nature by relying on the promise. *R.J. Longo Constr. Co. v. Transit Am., Inc.,* 921 F.Supp. 1295, 1305 (D.N.J.1996) (citing *Royal Assocs. v. Concannon,* 200 N.J.Super. 84, 91–92, 490 A.2d 357 (App.Div.1985)); *Peck,* 293 N.J.Super. at 165, 679 A.2d 745; *Fairken Assocs. v. Hutchin,*

---

**16.** DeJoy further argues:

In addition, defendants breached numerous other contractual terms affecting [DeJoy's] employment. Defendants discontinued [DeJoy's] salary effective April 7, 1995. Defendants informed plaintiff in writing on April 12, 1995 that he would be relegated to disability benefits in the amount of $2,500.00 per month, despite the fact that plaintiff had never filed an application with the insurance company for disability payments. In April of 1995, [D]efendants ceased paying for [DeJoy's] medical and hospital insurance coverage. Under written protest, [DeJoy] began paying the weekly premium for

insurance coverage to avoid the threatened termination of his benefits.

Opposition Brief at 33.

DeJoy does not address the manner in which these actions violated any "contractual terms" of his employment relationship with Defendants. As indicated, Suburban Cablevision's written policy, which was consistent with Comcast Cable's policy was to pay employees full salary for the first 120 days of medical leave. After 120 days, employees received benefits under a long term disability insurance policy. DeJoy, moreover, always paid his weekly premium for insurance coverage. DeJoy Dep. at 549.

223 N.J.Super. 274, 279–80, 538 A.2d 465 (Law Div.1987).

As indicated, DeJoy was an at will employee of Comcast Cable. Doyle's alleged promise that DeJoy would remain in his position did not give rise to a contractual agreement for a period of time or one in which DeJoy would only be discharged for cause. *Cf. Shebar,* 111 N.J. at 289–90, 544 A.2d 377 (statements to plaintiff that employer did "not fire its managers" and that he "had a job for life," intended to induce plaintiff to revoke his acceptance of competitor's job offer, were "sufficiently clear" and created a material question of fact whether plaintiff's at will employment contract was modified into contract with termination only for cause, precluding the entry of summary judgment). DeJoy was subject to termination from his employment, at the will of his employer. *Peck,* 293 N.J.Super. at 162, 679 A.2d 745; *see Shebar,* 111 N.J. at 285, 544 A.2d 377 ("Historically . . . employers have been able to terminate the employment of at-will employees for cause or for no cause at all, in the absence of an employment contract providing otherwise").

■ "[R]eliance on a promise of at-will employment frequently gives rise to no cause of action." *Peck,* 293 N.J.Super. at 165, 679 A.2d 745. Under New Jersey law, however, a plaintiff may rely upon the doctrine of promissory estoppel to recover for "losses incident to reliance upon the job offer itself, even though the employer can terminate the relationship at any time." *Id.* at 167, 679 A.2d 745.

In *Peck,* the plaintiff, a resident of Boston, was offered a job in New Jersey. 293 N.J.Super. at 158, 679 A.2d 745. After she had " 'rented' her apartment in Boston, 'found an apartment' in New Jersey, 'arranged for movers' and had 'given up her clients in Boston[,]' " the defendants rescinded their offer. *Id.*

The *Peck* court held that the plaintiff "should be permitted to proceed on a theory of promissory estoppel by virtue of her detrimental reliance on the promise of employment." 293 N.J.Super. at 168, 679 A.2d 745. The plaintiff's allegations "that she gave up her business and clients in Boston and sus-

tained losses in moving to New Jersey in reliance on the offer she accepted[,]" precluded the entry of summary judgment on her promissory estoppel claim. *Id.*

■ In the instant case, Defendants make an unsupported argument that DeJoy cannot establish he reasonably or justifiably relied upon Doyle's alleged promise of continued employment and that, in any case, he did not rely to his detriment. Opposition Brief at 27–29. Defendants specifically argue:

DeJoy was allegedly promised a job with Cablevision as the Regional Vice President of New Jersey with a salary that was expected to equal or exceed his existing salary. . . . DeJoy actually suggested the idea of creating such a position. . . . In contrast to Cablevision's alleged offer of responsibility for the entire state of New Jersey at a salary expected to match or exceed his existing salary, . . . Doyle allegedly promised . . . DeJoy only that he would be Area Vice President with his current responsibilities as well as two additional Comcast cable systems. . . . There is no evidence whatsoever that . . . Doyle ever discussed salary or compensation with . . . DeJoy concerning this alleged job offer. In short, . . . DeJoy simply cannot establish that he reasonably relied on . . . Doyle's promise in light of the alleged job offer from Cablevision that he proposed with specific salary information and greater responsibility.

Opposition Brief at 27–28.

Defendants appear to argue that the Cablevision offer of employment was superior to the Defendants' alleged promise of continued employment and, therefore, DeJoy may not rely upon the doctrine of promissory estoppel. Opposition Brief at 27–28. Defendants fail to cite any authority for this argument; no authority appears to exist.

As indicated, DeJoy must establish that he reasonably relied upon Defendants' alleged promise of continued employment. *R.J. Longo Constr.,* 921 F.Supp. at 1305; *Peck,* 293 N.J.Super. at 165, 679 A.2d 745. DeJoy states that he rejected Cablevision's offer

because he wanted to remain with Suburban Cablevision, assuming Comcast Cable intended to retain him as Vice–President and General Manager. DeJoy Dep. at 520–22; *see* Quinn Dep. at 75. Even assuming Defendants can demonstrate that the Cablevision offer was superior, a jury could conclude DeJoy reasonably relied upon Defendants' alleged offer of continued employment in rejecting the Cablevision offer.

Defendants further argue that, assuming DeJoy reasonably relied upon Defendants' alleged offer of continued employment, he did not rely to his detriment. Moving Brief at 28. Defendants note DeJoy received $299,395, pursuant to the Severance Agreement, that he would not have received if he had accepted Cablevision's offer and left Suburban Cablevision, prior to the "Control Change" on 22 December 1994. *Id.* at 28; *see id.,* Exh. F. Defendants also note DeJoy has secured lucrative employment after leaving Comcast Cable's employ. *Id.* at 29.

It appears unlikely DeJoy will be able to establish he relied upon Defendants' alleged promise to his detriment. As Defendants note, DeJoy received almost $300,000 by rejecting Cablevision's offer and remaining with Suburban Cablevision after 22 December 1994. Moving Brief at 28.

Despite DeJoy's receipt of the $300,000 and his employment with Cablevision, whether he has detrimentally relied upon Defendants' assurances appears to be a question of fact. DeJoy states his position as Senior Vice President with Rainbow Programing, a division of Cablevision, was not equivalent to the Regional Vice President for Cablevision and was, in fact, a temporary position. DeJoy Dep. at 545–46. Similarly, DeJoy maintains his current position as General Manager for several of Cablevision's cable systems is a temporary position. Blunda Cert., Exh. V.

As indicated, at the summary judgment stage, all evidence must be viewed in a light most favorable to the party opposing the motion. *Healey,* 78 F.3d at 130–31. Furthermore, all doubts must be resolved against the moving party. *Meyer,* 720 F.2d at 307 n. 2. Although it appears unlikely DeJoy will prevail on his promissory estoppel

claim, whether he has detrimentally relied upon Defendants' alleged assurances of continued employment appears to concern a genuine issue of material fact, precluding summary judgment.

### G. *Fraud/Misrepresentation*

■ As indicated, DeJoy alleges Defendants' representations that he would remain in his position as Area Vice President and General Manager after Comcast Cable acquired Suburban Cablevision, "were knowingly false at the time of their making with the intent to mislead [him]." Amended Complaint, ¶ 84. To prove fraud, under New Jersey law, DeJoy must demonstrate that (1) Defendants made a misrepresentation of material fact; (2) the misrepresentation was made with knowledge of its falsity; and (3) he justifiably relied on the misrepresentation to his detriment. *Lightning Lube, Inc. v. Witco Corp.,* 4 F.3d 1153, 1182 (3d Cir.1993) (citing *Jewish Ctr. of Sussex County v. Whale,* 86 N.J. 619, 624–25, 432 A.2d 521 (1981)); *Rodio v. Smith,* 123 N.J. 345, 352, 587 A.2d 621 (1991); *Nappe v. Anschelewitz, Barr, Ansell & Bonello,* 97 N.J. 37, 51–52, 477 A.2d 1224 (1984).

■ Defendants argue DeJoy cannot establish he relied upon Defendants' assurances of continued employment to his detriment. Moving Brief at 28. Defendants rely upon the factual argument that DeJoy cannot justifiably rely upon Defendants' assurances because the Cablevision offer was superior and because he cannot establish he relied to his detriment. *Id.* at 27–29. For the reasons discussed above, genuine issues of material fact remain as to whether DeJoy can establish justifiable reliance and detriment. Accordingly, summary judgment is not appropriate.

### H. *Tortious Interference with a Contractual Relationship and Prospective Economic Advantage*

As indicated, count XI of the Amended Complaint alleges Doyle and Baxter are liable for intentional interference with a contractual relationship between DeJoy and both Suburban Cablevision and Comcast Ca-

ble. Amended Complaint, ¶ 102a. Count XII of the Amended Complaint alleges Doyle and Baxter "maliciously interfered with [De-Joy's] prospective economic advantage" with Comcast Cable. *Id.,* ¶ 106.

■ Under New Jersey law, a claim for tortious interference with a prospective or existing economic relationship has five elements. Those elements are "(1) a plaintiff's existing or reasonable expectation of economic advantage or benefit; (2) a defendant's knowledge of the plaintiff's expectancy; (3) wrongful and intentional interference with that expectancy by the defendant; (4) a reasonable probability that the plaintiff would have received the anticipated economic advantage absent such interference; and (5) damages resulting from the defendant's interference." *Pitak,* 928 F.Supp. at 1369 (citing *Lightning Lube v. Witco,* 4 F.3d 1153, 1167 (3d Cir.1993)); *see Varrallo,* 94 F.3d at 848; *Printing Mart–Morristown v. Sharp Electronics Corp.,* 116 N.J. 739, 751–53, 563 A.2d 31 (1989).

■ As indicated, DeJoy has failed to establish the existence of a contract of employment. Accordingly, count XI of the Amended Complaint is dismissed. The determination that DeJoy was an at will employee, however, does not affect his claim of tortious interference with prospective economic advantage, contained in count XII of the Amended Complaint. *See Varrallo,* 94 F.3d at 848. No contract right is necessary to maintain this claim. *Id.*

■ "It is 'fundamental' to a cause of action for tortious interference with a prospective economic relationship that the claim be directed against defendants who are not parties to the relationship." *Printing Mart,* 116 N.J. at 752, 563 A.2d 31; *see also Cappiello v. Ragen Precision Indus., Inc.,* 192 N.J.Super. 523, 529, 471 A.2d 432 (App.Div. 1984) (tortious interference with contract "requires the meddling into the affairs of another") (citing *Sandler v. Lawn–A–Mat Chem. & Equip. Corp.,* 141 N.J.Super. 437, 450, 358 A.2d 805 (App.Div.), *cert. denied,* 71 N.J. 503, 366 A.2d 658 (1976)).

Defendants previously moved to dismiss count XII. *DeJoy I,* 941 F.Supp. at 477.

Defendants argued DeJoy failed to allege Baxter and Doyle acted outside of the scope of their employment and neither could therefore be considered a third party as to any prospective or existing economic relationship DeJoy might have had with Comcast Cable. *Id.* at 477. Defendants' motion to dismiss count XII was denied because DeJoy alleges Baxter and Doyle interfered with his prospective economic advantage with Comcast Cable for their *"own personal gain and advancement."* Amended Complaint, ¶ 106 (emphasis added). Under the principles of notice pleading, this allegation was read to allege Baxter and Doyle acted outside the scope of their employment with Comcast Cable. *DeJoy I,* 941 F.Supp. at 477–78.

In the Motion for Summary Judgment, Defendants argue DeJoy "has failed to produce any evidence that ... Doyle or Baxter personally gained from their alleged unlawful actions." Moving Brief at 32. DeJoy responds "Baxter and Doyle had a personal, monetary interest in ensuring that Comcast's transaction acquiring the Suburban and Jersey City properties went smoothly. A smooth transaction would include interfering with [DeJoy's] employment relationships to the extent necessary to secure the acquisition." Opposition Brief at 30.

DeJoy has not uncovered any evidence supporting his allegations that either Baxter or Doyle acted outside the scope of their employment for their own personal gain and advancement. Significantly, DeJoy stated he did not think either Baxter or Doyle financially gained from his removal. DeJoy Dep. at 630–31. Doyle merely asserts Doyle "got what he wanted" because he was able to hire Fischer, his friend. *Id.* at 630.

DeJoy has not met his burden of proving Baxter and Doyle acted outside of the scope of their employment. DeJoy, moreover, has not demonstrated that Baxter or Doyle acted "'without justification or excuse'" and, therefore, has not established they acted maliciously. *MacDougall,* 144 N.J. at 404, 677 A.2d 162.

DeJoy's argument that he has been unable to determine the manner in which Baxter and Doyle personally profited because coun-

sel for Defendants directed Doyle, during his deposition, "not to answer questions regarding his compensation" is without merit. Opposition Brief at 30. The following discussion took place during Doyle's deposition:

Q. For the calendar year 1995 what was your gross compensation package from Comcast?

[Counsel for Defendants]: I object. I instruct the witness not to answer. What possible relevance does that have in a case like this? We don't have a confidentiality agreement that you have agreed to enter into at this point and certainly don't see what the relevance of asking this witness a private, personal question like that would be.

[Counsel for DeJoy]: The witness is an individual defendant in a lawsuit that alleges he engaged in discrimination and tortious action. His compensation from his employer is relevant to the cause of action against him. It's certainly relevant to the damage claim. Are you directing the witness not to answer?

[Counsel for Defendants]: How is it relevant to the damage claim?

[Counsel for DeJoy]: There is an ability to recover both punitive damages and exemplary damages from an individual witness. I have a right to probe as to his compensation and as to his assets.

[Counsel for Defendants]: Well, I would direct him not to answer *at this point. Perhaps that's an issue that we can discuss later,* but I don't see that has any bearing on this case.

[Counsel for DeJoy]: You're going to instruct the witness the same as to calendar year 1994?

[Counsel for Defendants]: Yes.

[Counsel for DeJoy]: And the same for calendar year 1996?

[Counsel for Defendants]: Yes.

[Counsel for DeJoy]: Could you mark the transcript.

Doyle Dep. at 9–10 (emphasis added). Later during the deposition, Counsel for DeJoy returned to the subject of Doyle's compensation:

Q. Now, I had asked at the beginning of last session, I'll just ask again for the record, what your total compensation package was for calendar year 1994?

[Counsel for Defendants]: Same objection.

[Counsel for DeJoy]: Okay. I assume the objection will continue for '95 and '96?

[Counsel for Defendants]: Yes.

[Counsel for DeJoy]: And you're directing the witness not to answer?

[Counsel for Defendants]: Yes. *That's an issue we can take up.*

Doyle Dep. at 224 (emphasis added).

DeJoy is precluded from arguing that inadequate discovery precludes entry of summary judgment. DeJoy has not established that additional discovery is necessary for him to respond to the Motion for Summary Judgment and he has not adequately explained his failure to obtain the information sought during the course of discovery. *See* Fed. R.Civ.P. 56(f) ("Rule 56(f)"). Rule 56(f) provides:

Should it appear from the affidavits of a party opposing the motion that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just.

*Id.*

 Although Rule 56(f) appears to require the "party opposing the motion" to submit an affidavit, the Circuit has held that "failure to support a Rule 56(f) motion by affidavit is not automatically fatal to its consideration." *St. Surin v. Virgin Islands Daily News, Inc.,* 21 F.3d 1309, 1314 (3d Cir. 1994). Whether a Rule 56(f) motion should be granted depends on the particular information that is sought, how the information, if brought out, would preclude summary judgment and why the information has not been previously obtained. *San Filippo v. Bongiovanni,* 30 F.3d 424, 432 (3d Cir.1994), *cert. denied,* 513 U.S. 1082, 115 S.Ct. 735, 130 L.Ed.2d 638 (1995); *St. Surin,* 21 F.3d at 1314; *Contractors Assoc. v. City of Philadel-*

*phia,* 945 F.2d 1260 (3d Cir.1991). "Essentially, a party moving for postponement under Rule 56(f) must inform the district court why delay is needed before the motion can be properly considered." *St. Surin,* 21 F.3d at 1314.

■ DeJoy has not asked for a continuance nor has he requested further discovery on the issue of Doyle's compensation. Aside from the conclusory argument contained in the Opposition Brief, DeJoy does not explain how the information may preclude the entry of summary judgment. DeJoy, moreover, has not satisfactorily explained his failure to obtain the relevant information during discovery. Significantly, after Doyle's deposition in October of 1996, DeJoy did not move to compel production of the information sought. Accordingly, DeJoy's failure to obtain information regarding Doyle's compensation during discovery does not preclude the entry of summary judgment on counts XI and XII. *See San Filippo,* 30 F.3d at 432–33.

### I. *Intentional Infliction of Emotional Distress*

As indicated, DeJoy alleges Defendants' actions constituted "outrageous conduct beyond all bounds of decency." Amended Complaint, ¶ 110. Specifically, DeJoy alleges

> [t]he conduct of [D]efendants in: defrauding [DeJoy] to remain with the company after its takeover; fraudulently inducing [DeJoy] to seek cooperation from other Suburban Cable[vision] employees; repeatedly assuring [DeJoy] that he would be Area Vice President with expanded responsibilities; announcing to regulators and nearly 500 Suburban employees on December 2, 1994, just six days prior to [DeJoy's] ruptured aortic aneurysm on December 8, 1994, that [DeJoy] would be made Area Vice President; removing [DeJoy] from his position as soon as [D]efendants learned that [DeJoy] was hospitalized in critical condition; threatening to cease his insurance coverage; proposing a non-existent job; and telling him that this economic pressure could be relieved and he would be restored to full salary if he would leave the company quietly is outra-

geous conduct beyond all bounds of decency.

Amended Complaint, ¶ 110.

■ Under New Jersey law, to establish a claim for intentional emotional distress, DeJoy must prove (1) conduct by Defendants "'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency and to be regarded as atrocious, and utterly intolerable in a civilized community,'" (2) an intentional act, committed with the intent to produce emotional distress or in deliberate disregard of a high degree of probability that emotional distress will follow, (3) causation and resulting emotional distress that is "'so severe that no reasonable [person] could be expected to endure it.'" *Glenside West Corp. v. Exxon Co., USA,* 761 F.Supp. 1100, 1113 (D.N.J.1991) (quoting *Buckley,* 111 N.J. at 366, 544 A.2d 857); *see Pitak,* 928 F.Supp. at 1371; *Bishop v. Okidata, Inc.,* 864 F.Supp. 416, 427 (D.N.J. 1994).

"One New Jersey court found conduct constituting intentional infliction of emotional distress where a physician knowing it to be false, told parents their son was suffering from cancer." *Glenside West,* 761 F.Supp. at 1113 (discussing *Hume v. Bayer,* 178 N.J.Super. 310, 428 A.2d 966 (Law Div.1981)). The elements were established in another case where a hospital was unable to locate the body of a deceased baby for three weeks. *Id.* (discussing *Muniz v. United Hosps. Med. Ctr. Presbyterian Hosp.,* 153 N.J.Super. 79, 379 A.2d 57 (App.Div.1977)). Other courts have determined awards for intentional infliction of emotional distress were appropriate in a case where a defendant spread a false rumor that the plaintiff's son had hung himself, in another case involving defendants who brought a mob to the plaintiff's door and threatened to lynch him if he did not leave town, and in another case where "'a gory dead rat [was wrapped] inside a loaf of bread for a sensitive person to open.'" *Glenside West,* 761 F.Supp. at 1113–14 (citations omitted).

■ The facts of the instant case do not support a claim for intentional infliction of emotional distress. There is no indication Defendants intended to cause DeJoy emo-

tional distress. Furthermore, aside from a conclusory argument that Defendants' employment decisions "transcended all bounds of decency," Opposition Brief at 34, DeJoy has not addressed the manner in which Defendants' actions caused him emotional distress or that his distress was "so severe that no reasonable man could be expected to endure." *See Buckley,* 111 N.J. at 366, 544 A.2d 857.

Courts, moreover, have been particularly reluctant to allow claims for intentional infliction of emotional distress by discharged employees against their employers. *See, e.g., Pitak,* 928 F.Supp. at 1371; *Carney v. Dexter Shoe Co.,* 701 F.Supp. 1093, 1104 (D.N.J. 1988); *Gennari v. Weichert Co. Realtors,* 288 N.J.Super. 504, 550, 672 A.2d 1190 (App.Div. 1996) (finding no evidence plaintiff had suffered emotional distress " 'so severe no reasonable man could be expected to endure' "); *Morgan v. Union County Bd. of Chosen Freeholders,* 268 N.J.Super. 337, 354, 633 A.2d 985 (App.Div.1993) (affirming rejection of claim by discharged employee of intentional infliction of emotional distress), *cert. denied,* 135 N.J. 468, 640 A.2d 850 (1994). Accordingly, summary judgment is granted to Defendants with respect to count XIII.[17]

*Conclusion*

For the reasons stated, the Motion for Summary Judgment is granted in part and denied in part pursuant to Rule 56(c). Counts V, VIII, XI, XII and XIII of the Amended Complaint are dismissed. To the extent it seeks the dismissal of the remaining counts, the Motion for Summary Judgment is denied. An order accompanies this opinion.

---

17. Defendants alternative argument that DeJoy's claim for intentional infliction of emotional distress is barred under the New Jersey Workers' Compensation Act, Moving Brief at 38–40, will not be addressed.